**TOWN OF FLOWER MOUND,**
Texas, Appellant,

v.

**Tom TEAGUE and David
Burkett, Appellees.**

No. 2–00–193–CV.

Court of Appeals of Texas,
Fort Worth.

June 26, 2003.

**747**

Joe C. Tooley, Edwin P. Voss, Jr, Brown & Hofmeister, L.L.P., Dallas, for Appellant.

Darrin Walker, Chandler Law Offices, Lufkin, for Appellee.

PANEL A: CAYCE, C.J.; DAY and GARDNER, JJ.

## OPINION ON REHEARING

JOHN CAYCE, Chief Justice.

### I. Introduction

We withdraw our opinion and judgment of April 17, 2003 and substitute the following. We deny the Town of Flower Mound's motion for rehearing.

In this whistleblower case, the Town of Flower Mound, Texas appeals from a jury verdict for two former police officers, Tom Teague and David Burkett. In twelve issues, the Town challenges the legal and factual sufficiency of the evidence to support the trial court's judgment, contends there are errors in the jury charge and the judgment, complains that the trial court improperly denied the Town's post-judgment motions, complains that several of the trial court's evidentiary rulings were erroneous, and contends that it is entitled to a new trial due to inaccuracies in the reporter's record. We will affirm in part and reverse and remand in part.

### II. Background Facts and Procedural History

In 1995, Teague and Burkett were police officers for the Town. They were assigned to the criminal investigation division (C.I.D.) of the Town's police department. On November 28, 1995, Town patrol officers attempted to serve a witness subpoena on Mary Womack in connection with a criminal case. The defendant in that case had moved to suppress the evidence that

Wess Jones, a patrol officer, had obtained with a search warrant, and assistant district attorney Brian Slabotsky planned to call Mary as a witness at the suppression hearing.

Mary lived with her father-in-law, Ernest Womack, Sr. When the officers went to Ernest's home to serve the subpoena, Ernest informed them that Mary was not there, but had left several days earlier with a car that he had purchased for Mary but that actually belonged to him. Ernest said that he had told Mary not to leave or take the car and that he wished to file theft charges against her. Officer Bentley took down the information and prepared a police report for unauthorized use of a motor vehicle (UUMV). *See* Tex. Penal Code Ann. § 31.07 (Vernon 2003).

Through their prior dealings with the Womacks, most of the patrol officers knew that Mary and Ernest had been living together as husband and wife and that the missing car was "basically" Mary's, even though it was registered to Ernest. The officers were familiar with what the car looked like and had seen Mary driving it around town for a couple of years. In this type of situation, the police department typically did not file criminal charges. Consequently, while Bentley was completing the police report, Sergeant Greg Jones of the patrol division instructed him to entitle the report as a missing persons report rather than as a UUMV report. Bentley complied with this order. As titled, the report alleged a nonprosecutable incident (missing person) rather than a prosecutable offense (UUMV). Apart from the title, however, the report alleged all the elements of UUMV.

At that time, Burkett was responsible for reviewing cases and warrants issued within C.I.D. On the morning of November 29, Burkett reviewed the missing persons report on Mary and assigned it to Investi-gator Ron McFadden. Burkett noted, however, that the report contained all of the elements of UUMV. During the departmental briefing on the same morning, Burkett informed the investigators that he would contact Greg Jones to find out more about the case and that, if it should prove to be a UUMV, the case would be reassigned as a property offense. Greg Jones was in court that day, however, so Burkett was unable to contact him immediately.

Also on November 29, Wess Jones learned of the report, and that Mary could not be found, during a meeting with Slabotsky. Wess left that meeting with the understanding that he needed to determine why the report had not been filed as a UUMV and why, as a result, there was no warrant for Mary's arrest.

Wess Jones went to Burkett's office and asked why the case was not being handled as a UUMV. There is conflicting evidence concerning the details of their conversation. Burkett stated that he told Wess Jones he was sure Greg Jones had reasons for not making the report a UUMV and instructed Wess not to take any other action in the case until Burkett had talked with Greg. Burkett did not indicate any knowledge of Wess's conversation with Slabotsky. Wess Jones testified that Burkett said he also believed it should have been a UUMV, but that patrol, not C.I.D., had decided how the report should be titled. Wess further testified that he relayed to Burkett the conversation with Slabotsky and asked if it would be a problem to change the report to UUMV. According to Wess Jones, Burkett replied that, unless the investigator working on the case knew something that Burkett did not, Burkett did not see why the report should not be a UUMV. Burkett also told Jones where the report was and who the investigator was.

Wess Jones then contacted Bentley and asked if Bentley would object to the title of the report being changed from missing persons to UUMV. Bentley responded that he believed only C.I.D. could authorize the change, but that it was fine to change the report if C.I.D. gave the approval.

Wess Jones also contacted Teague, who was head of C.I.D. and its internal affairs investigator. Wess asked Teague why the report had not been filed as a theft or UUMV. Like the testimony about the Wess–Burkett conversation, the testimony about this conversation is contradictory. Teague stated that he explained to Wess that this type of situation did not qualify as a theft and that he instructed Wess not to list the car as stolen, but to leave the report as a missing persons report. Teague's opinions were apparently based on the Denton County District Attorney's office's long-standing guidelines that excluded the prosecution of this type of situation as a theft or UUMV. Like Burkett, Teague did not indicate any knowledge of Wess's conversation with Slabotsky.

Conversely, Wess Jones testified that, after gathering information from the investigator and Bentley, he determined that it would probably be okay to change the report. Burkett was not in his office, so Wess spoke with Teague and "explained the whole situation to him." According to Wess, Teague told Wess that Wess needed to prepare a probable cause affidavit, obtain a warrant, and have the warrant information entered into the county's computer so that Mary would be served with it if she was stopped by an officer.

Wess Jones then obtained permission from his supervisor, Sergeant Mike Pascoe, to change the report title from miss-

ing persons to UUMV. Pascoe also helped Wess prepare the probable cause affidavit and obtain a warrant for Mary's arrest for UUMV.

On December 5, Burkett learned that a warrant had been issued for Mary's arrest. This development raised questions in Burkett's mind. After checking with Greg Jones and the records department, he discovered that a judge had issued the warrant because Wess Jones had changed the title on the offense report and attached the altered report to a probable cause affidavit. Burkett was concerned that Wess Jones had committed a felony by arranging for Mary to be arrested under false pretenses. Consequently, on December 6, he and Greg Jones notified Teague about the situation.

After discussing the matter with Burkett and Greg Jones and reviewing their paperwork, Teague also concluded that Wess Jones may have violated the law by changing Bentley's report from a missing persons report to a felony offense report in order to arrest Mary for a felony offense, simply as a pretext for getting her into court as a witness. Like Burkett, Teague believed this was a felony offense; therefore, he decided to contact the Denton County District Attorney's office for advice on how to proceed. Teague was not certain whether the proper procedure would be to just conduct an internal affairs investigation, or whether a criminal investigation was also necessary. The three officers met with assistant district attorney Kevin Henry, the district attorney's chief intake officer. Henry confirmed that Wess Jones's behavior was consistent with both misdemeanor and felony violations.[1]

1. A person commits the offense of tampering with or fabricating physical evidence if, knowing that an investigation or official proceeding is pending or in progress, he makes, presents, or uses any record, document, or thing with knowledge of its falsity and with intent to affect the course or outcome of the

Henry recommended that the case be prepared for grand jury review and that the department also proceed with a parallel internal affairs investigation. Teague reported these events and Henry's recommendation in a December 7 memo to Chief David Brungardt. Teague also recommended to Chief Brungardt that Wess Jones immediately be placed on administrative leave with pay, pending the outcome of the investigations. With Chief Brungardt's authorization, Wess Jones was placed on administrative leave on December 8, 1995.

Wess Jones was also notified of the investigations and the possible criminal charges against him. Teague put himself in charge of the internal affairs investigation and assigned Burkett the criminal one. During this time, Teague and Chief Brungardt officed directly across from each other and attended the same departmental staff meetings almost every morning. Chief Brungardt "pretty much signed off" on the steps Teague took in the investigations and did not voice any objections.

On December 19, 1995, Teague telephoned Town Attorney Terrance S. Welch and asked whether the Town would accept Wess Jones's resignation if it turned out that Jones had committed criminal violations.[2] After talking with Teague, Welch became concerned that the two parallel investigations were not being conducted separately and that Chief Brungardt may not have been informed of the full extent

of the investigations. Welch called Henry, the Town's human resources director, and the previous acting police chief, and he left a message for Chief Brungardt, who was out of the office. On December 20, Welch met with the human resources director and the previous acting police chief and recommended that the Town hire the firm of Parker–Jones, Inc. to conduct an independent investigation of the Wess Jones matter. The three then made this recommendation to the mayor, who agreed with it. At the end of the meeting with the mayor, Chief Brungardt arrived. Chief Brungardt seemed a little concerned about an outside investigation firm being hired, but he did not disagree with the decision to hire Parker–Jones.

On the afternoon and evening of December 20, Chief Brungardt ordered both Teague and Burkett to stop all investigations into the Wess Jones incident.

Parker–Jones investigated the matter. In early January 1996, Parker–Jones reported to Welch verbally its determination that Wess Jones had not committed any crime and that Teague's and Burkett's investigations may have been malicious. Welch reported Parker–Jones's findings to Chief Brungardt, and, as a result, Wess Jones was taken off of administrative leave. Parker–Jones then gave the Town a written report of its findings and conclusions on February 9, 1996.

---

investigation or official proceeding. Tex. Penal Code Ann. § 37.09(a)(2).

A person commits the offense of tampering with a governmental record if he: (1) knowingly makes a false entry in, or false alteration of, a governmental record; or (2) makes, presents, or uses any record, document, or thing with knowledge of its falsity and with intent that it be taken as a genuine governmental record. *Id.* § 37.10(a)(1)-(2).

A public servant commits the offense of official oppression if, acting under color of his

office, he intentionally subjects another to arrest or detention that he knows is unlawful. *Id.* § 39.03(a)(1).

2. There is conflicting evidence about when Welch learned of Teague's investigation of Wess Jones. Teague testified that he reported the matter to Welch shortly after he began his investigation. Welch testified that he first learned of the matter on December 19.

On January 15, 1996, Teague asked to be demoted from his position as lieutenant of C.I.D. and to be transferred to patrol sergeant. Also on January 15, Burkett was transferred out of C.I.D. to the deep night patrol shift, and Sergeant Ronald Nottingham was transferred from patrol to Teague's former position in C.I.D. Wess Jones was returned to regular duty on January 16.

After assuming his new position, Nottingham approached Chief Brungardt and expressed his concern about the enormous backlog of cases in C.I.D. Chief Brungardt discussed this backlog with Welch and Ron Ragland, the Town manager. Welch and Ragland decided to retain Parker–Jones again, this time to investigate C.I.D. primarily, but also to conduct further investigation into the Wess Jones matter. Chief Brungardt went along with this decision.

Meanwhile, Teague contacted Henry to find out whether the documentation on the Wess Jones matter had been presented to the district attorney's office. Upon learning that it had not, Teague and Burkett attempted to file a grievance with Ragland, the Town manager. They were told, however, that they had to file their complaint with Chief Brungardt first, or their failure to do so would be considered insubordination. They also requested a meeting with Chief Brungardt to discuss the matter, but Chief Brungardt refused to meet with them. On January 25, appellees filed a written grievance with Chief Brungardt, in which they stated their concerns that: Chief Brungardt and Wess Jones had developed a close personal and working relationship; either Wess had lied about his actions related to the Mary Womack report and arrest warrant or the individuals whose accounts of the incidents conflicted with Wess's account had lied; Chief Brungardt had chosen not to submit appellees' documented evidence concerning the Wess

Jones incident to the district attorney's office, but had instead, contrary to departmental procedure, substituted only verbal interpretations that were consistent with his own purposes; and Chief Brungardt had elected to cover up either Wess Jones's or his accusers' allegations.

Two days later, Teague and Burkett requested a meeting with Ragland. Although Chief Brungardt approved the request on January 30, the meeting was later cancelled. Instead, Chief Brungardt placed Teague and Burkett on administrative leave with pay on January 31, pending an investigation into their alleged dereliction of duty, including the backlog of cases in C.I.D. and their investigation of the Wess Jones matter.

On February 5, 1996, Chief Brungardt denied appellees' grievance, and they appealed that determination to Ragland. The record does not contain any ruling from Ragland.

After conducting its second investigation, Parker–Jones determined that Teague and Burkett had been derelict in their duties by leaving so many cases in C.I.D. open during their tenure there. Parker–Jones also concluded that Wess Jones "was maliciously subjected to an internal investigation." On May 23, 1996, Chief Brungardt presented Teague and Burkett with copies of the second Parker–Jones report, which numbered 1200–1500 pages in length, and asked them to respond to the report. In early June 1996, Teague and Burkett were discharged, allegedly based on the findings in the Parker–Jones report.

Teague and Burkett then filed the underlying whistleblower action. The jury returned a verdict in their favor, the trial court rendered judgment on the verdict, and this appeal followed.

## III. Sufficiency of Evidence

In its first, second, third, sixth, seventh, and eighth issues, the Town contends the evidence is legally and factually insufficient to establish that appellees made a good faith report of a violation of law to an appropriate law enforcement authority. The Town further contends that the evidence is legally and factually insufficient to establish a causal link between appellees' report and their termination. Finally, the Town asserts that the evidence shows appellees' discharge would have occurred even if they had not made a report that is protected by the Act.

### A. Standards of Review

In determining a "no-evidence" issue, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex.2001); *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cazarez*, 937 S.W.2d at 450; *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact. *Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex.1992).

An assertion that the evidence is "insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). We are required to consider all of the evidence in the case in making this determination. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.), *cert.*

*denied*, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

### B. Good Faith Report

■ The Act prohibits a state or local governmental entity from terminating the employment of a public employee who in good faith reports a violation of law by another public employee to an appropriate law enforcement authority. Tex. Gov't Code Ann. § 554.002(a) (Vernon Supp. 2003). The Act is remedial in nature and must be liberally construed. *Castaneda v. Tex. Dep't of Agric.*, 831 S.W.2d 501, 503 (Tex.App.-Corpus Christi 1992, writ denied). Its purposes are (1) to enhance openness in government by protecting public employees who inform proper authorities of legal violations and (2) to secure governmental compliance with the law on the part of those who direct and conduct governmental affairs. *Upton County v. Brown*, 960 S.W.2d 808, 817 (Tex.App.-El Paso 1997, no pet.); *Tarrant County v. Bivins*, 936 S.W.2d 419, 421 (Tex.App.-Fort Worth 1996, no writ).

■ The Texas Supreme Court has defined good faith to mean that (1) the employee believed that the conduct reported was a violation of law and (2) the employee's belief was reasonable in light of the employee's training and experience. *Wichita County v. Hart*, 917 S.W.2d 779, 784 (Tex.1996) (*Wichita I*). The first prong of this test takes into consideration the employee's subjective belief: whether the employee honestly believed the conduct reported was a violation of law. *Id.* at 784–85. The second prong is objective because it measures the employee's belief against that of a reasonably prudent employee in similar circumstances. *Id.* at 785. Because of his training and experience in assessing legal violations, the reasonableness of a peace officer's belief that a law has been violated will be examined

more closely than will the belief of a person who is not in law enforcement. *Harris County Pct. Four Constable Dep't v. Grabowski*, 922 S.W.2d 954, 956 (Tex. 1996); *Wichita County v. Hart*, 989 S.W.2d 2, 6 (Tex.App.-Fort Worth 1999, pet. denied) (*Wichita II*). A report of an alleged violation of law may be in good faith even though incorrect, however, as long as a reasonable person with the employee's same level of training and experience would also have believed that a violation had occurred. *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 320 (Tex. 2002); *Wichita I*, 917 S.W.2d at 785–86.

In this case, the evidence shows that both Burkett and Teague honestly believed that Wess Jones had violated the law if he had changed Bentley's report so that Mary would be arrested simply as a pretext for getting her into court as a witness. Also, Teague's memorandum placing Wess on administrative leave lists the elements of four criminal offenses: perjury, tampering with or fabricating physical evidence, tampering with a government record, and official oppression. This evidence is legally and factually sufficient to satisfy the first prong of the good faith test.

There is also evidence that a reasonably prudent law enforcement officer in similar circumstances would have believed a violation of law had occurred. The record shows that Kevin Henry in the district attorney's office believed that Wess's conduct was consistent with certain crimes. In addition, Chief Brungardt's authorization of the placement of Wess Jones on administrative leave is evidence that Chief Brungardt also believed one or more violations of law had occurred. This evidence

is legally and factually sufficient to satisfy the second prong of the good faith test.[3]

The Town contends that appellees' belief that a violation of law had occurred was not in good faith because Parker–Jones concluded as a result of its investigation that Wess Jones had committed no crime. The Town further contends that, if no violation of law occurred, appellees could not have reported it in good faith.

Whether a violation of law has occurred is a question of law for the court to decide. *Rogers v. City of Fort Worth*, 89 S.W.3d 265, 274 (Tex.App.-Fort Worth 2002, no pet.); *see also* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES PJC 107.4 cmt. (2000) (stating that whether report concerned a violation of "law" and whether person or entity receiving report is "appropriate law enforcement authority" are questions of law). *But see Tex. Dep't of Crim. Justice v. Terrell*, 925 S.W.2d 44, 59 (Tex.App.-Tyler 1995, no writ) (addressing "law" as an issue of fact). Thus, Parker–Jones's conclusion is not dispositive of whether Wess Jones violated a law. In addition, appellees' good faith belief is judged based on the information they had before them when they made their report to the district attorney and Chief Brungardt, not on the potentially exonerating evidence that Parker–Jones may have later discovered. *See Wichita I*, 917 S.W.2d at 785 (focusing on whether reasonably prudent employee *in similar circumstances* would have believed that the facts as reported were a violation of law).

Further, even if appellees were incorrect in their belief that Wess Jones had violat-

---

3. Although Wess Jones testified that he changed the report with Burkett's tantamount approval and Teague's help, and possibly at Slabotsky's direction, the jury was free to disbelieve Wess Jones's testimony, believe appellees' testimony, and resolve any inconsistencies in the evidence. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986) (holding that trier of fact may believe one witness, disbelieve others, and resolve inconsistencies in the testimony of any witness).

ed a law, their report was still made in good faith if a reasonable person with appellees' same level of training and experience would also have believed that a violation of law had occurred. *See id.* at 785–86; *see also Needham,* 82 S.W.3d at 320 (holding that employee who reports violation of law to an agency that is not an appropriate law enforcement authority may nonetheless be entitled to whistleblower protection if he, in good faith, believed agency was the appropriate authority). The evidence here supports the jury's finding of such a good faith belief with regard to Wess Jones.[4]

■■■ The Town asserts, however, that there is no evidence to support the jury's finding that appellees had a good faith belief that Chief Brungardt's alleged cover-up was a violation of law and, consequently, the judgment should be reversed even if the evidence supports the jury's finding as to Wess Jones. Neither Teague nor Burkett have contended that they believed in good faith that Chief Brungardt had violated a law, and they did not report

Chief Brungardt's alleged cover-up to the district attorney's office. Instead, they simply filed an employee grievance with the Town, alleging violations of two police department administrative orders. This is not evidence that appellees believed Chief Brungardt had violated the law.[5] However, the lack of sufficient evidence to support a finding that appellees believed in good faith that Chief Brungardt's alleged cover-up was a violation of law does not support reversal of the judgment in this case. Appellees' good faith report of an alleged violation of law by either Wess Jones or Chief Brungardt was sufficient to establish the good faith element of their whistleblower claim. *See* TEX. GOV'T CODE ANN. § 554.002(a) (providing that governmental entity may not terminate the employment of a public employee who in good faith reports *a* violation of law).[6] Because there is sufficient evidence to support the jury's finding that appellees in good faith reported a violation of law by Wess Jones, the judgment must be upheld.[7]

---

4. In light of our holdings regarding appellees' good faith, we need not consider whether Wess actually violated the law. *See* TEX.R.APP. P. 47.1; *Wichita I,* 917 S.W.2d at 785–86.

5. The Act does not protect reports of violations of internal departmental policy that were not promulgated pursuant to a statute or ordinance. *See Ruiz v. City of San Antonio,* 966 S.W.2d 128, 130 (Tex.App.-Austin 1998, no pet.); *see also Grabowski,* 922 S.W.2d at 955–56 (holding that deputy's belief that he had reported a violation of law was not reasonable where the violation was simply that of an internal departmental policy). Burkett testified that the commission of an illegal act by another officer or Chief Brungardt was "not an employee grievance."

6. Appellees' suit was, in effect, based on two theories of recovery. When a party obtains favorable jury findings on two or more theories of recovery and one of the theories is declared invalid, the party is still entitled to recover under the other theory. *Boyce Iron Works, Inc. v. S.W. Bell Tel. Co.,* 747 S.W.2d

785, 787 (Tex.1988); *Durban v. Guajardo,* 79 S.W.3d 198, 207 (Tex.App.-Dallas 2002, no pet.); *see also Thomas v. Oldham,* 895 S.W.2d 352, 359–60 (Tex.1995) (overruling appellant's no-evidence challenge where appellant did not object to broad-form submission or challenge legal sufficiency of evidence to support entire verdict).

7. *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378 (Tex.2000) and *Harris County v. Smith,* 96 S.W.3d 230 (Tex.2002) do not apply here because the Town did not object to the broad-form submission of the liability question, nor did it object to the question on the basis that it included a ground that was unsupported by the evidence. *See Casteel,* 22 S.W.3d at 389 (reversing for new trial where single broad-form liability question commingled valid and invalid liability grounds, appellant objected to question, and court could not determine whether jury based its verdict on invalid theory); *see also Smith,* 96 S.W.3d at 234 (applying *Casteel* to broad-form damages question that included elements of damages for which

## C. Appropriate Law Enforcement Authority

■ The Town also contends that the evidence is legally insufficient to support a finding that appellees made their report to an "appropriate law enforcement authority," because appellees simply reported Chief Brungardt's alleged cover-up of the Wess Jones incident to Ragland, the Town manager, who was not an appropriate law enforcement authority.[8]

The Town does not, however, dispute that the district attorney and Chief Brungardt were appropriate law enforcement authorities under the Act's definition or that appellees reported Wess Jones's alleged violations of law to these authorities.[9] Thus, for the reasons stated above, appellees' report of Wess Jones's alleged violations of law to the district attorney and Chief Brungardt was sufficient to establish this element of their whistleblower claim. *See* TEX. GOV'T CODE ANN. § 554.002(a).[10]

## D. Causation

The Town asserts that the evidence is legally and factually insufficient to establish that appellees were discharged because they made good faith allegations against Wess Jones and because they complained to Chief Brungardt about his al-

leged cover-up of the Wess Jones matter. Instead, the Town contends that appellees were discharged because of poor job performance, dereliction of duty, and, in Burkett's case, insubordination for refusing to take a polygraph examination.

■ To prove causation in a whistleblower case, an employee need not prove that his reporting of the illegal conduct was the sole reason for the employer's adverse action. *Tex. Dep't of Human Servs. v. Hinds,* 904 S.W.2d 629, 634 (Tex. 1995); *City of Fort Worth v. Zimlich,* 975 S.W.2d 399, 406 (Tex.App.-Austin 1998) (*Zimlich I*), *rev'd in part on other grounds,* 29 S.W.3d 62 (2000). Rather, to show causation, a public employee must demonstrate that after he reported a violation of law, in good faith, to an appropriate law enforcement authority, the employee suffered discriminatory conduct by his employer that would not have occurred when it did had the report not been made. *City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 67 (Tex.2000) (*Zimlich II*); *Hinds,* 904 S.W.2d at 637. This causation standard has been described as a "but for" causal nexus requirement. *Tex. Natural Resource Conservation Comm'n v. McDill,* 914 S.W.2d 718, 723 (Tex.App.-Austin 1996, no writ).

there was no evidentiary support, where appellant timely and specifically objected to question).

**8.** "Appropriate law enforcement authority" is defined in the Act as an authority who is a part of a state or local governmental entity or of the federal government that the employee in good faith believes is authorized to: (1) regulate under or enforce the law alleged in the report to have been violated; or (2) investigate or prosecute a violation of criminal law. TEX. GOV'T CODE ANN. § 554.002(b). The determination of who is an appropriate law en-

forcement authority is a question of law. *Needham,* 82 S.W.3d at 318.

**9.** Police officers and district attorneys are appropriate law enforcement authorities because they are authorized to investigate or prosecute violations of criminal law. *See* TEX. GOV'T CODE ANN. § 554.002(b)(2); *see also* TEX. CODE CRIM. PROC. ANN. arts. 2.01, 2.12(3), 2.13 (Vernon Supp.2003) (setting out duties of district attorneys and peace officers).

**10.** *See* p. 754 herein (discussing why appellees' failure to meet their burden of proof with regard to Chief Brungardt does not defeat their whistleblower claim).

Circumstantial evidence may be sufficient to establish a causal link between the adverse employment action and the reporting of the illegal conduct. *Zimlich II*, 29 S.W.3d at 69. Such evidence includes: (1) knowledge of the report of illegal conduct; (2) expression of a negative attitude toward the employee's report of the conduct; (3) failure to adhere to established company policies regarding employment decisions; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the adverse employment action was false. *Id.; Cazarez*, 937 S.W.2d at 451. But evidence that an adverse employment action was preceded by a superior's negative attitude towards an employee's report of illegal conduct is not enough, standing alone, to show a causal connection between the two events. There must be more. *Zimlich II*, 29 S.W.3d at 69.

Here, it is undisputed that both people involved in the decision to terminate appellees' employment—Chief Brungardt and Welch—knew of appellees' reports regarding Wess Jones. Chief Brungardt also knew of appellees' complaint about his alleged cover-up of the Wess Jones matter. Welch expressed a negative attitude toward appellees' report of Jones's conduct. Welch testified that, almost immediately after learning of the report and the investigation, he sought to remove appellees from the investigation and hire Parker–Jones. Welch testified that he hired Parker–Jones because of his concern about the way Teague was handling the internal investigation and his apparently mistaken belief that Chief Brungardt was unaware of appellees' investigation and the possible charges against Wess Jones. Part of Welch's motivation, however, was his concern that the filing of criminal charges against Wess Jones would be "a big issue in the press."

In addition, he made the decision to hire Parker–Jones without even consulting Chief Brungardt until after the mayor had already approved the decision.

Chief Brungardt initially did not express a negative attitude towards appellees' report of Wess Jones's conduct. Later, however, he became "visibly angered" when Teague expressed his intent to involve a Texas Ranger, at assistant district attorney Henry's suggestion, in conducting a completely independent criminal investigation. Chief Brungardt also ordered appellees to stop investigating the Wess Jones matter after authorizing them to conduct the investigation in the first place. In addition, appellees were placed on administrative leave so they could be investigated for alleged falsification of Town records and dereliction of duty—just three-and-a-half months after Chief Brungardt had approved an outstanding performance evaluation for Burkett and one month after Chief Brungardt had personally given Teague an outstanding performance evaluation.

There is also evidence that the Town did not adhere to its established policies regarding employment decisions. For instance, when Chief Brungardt ordered Teague to stop investigating Wess Jones, he did so by phone call to Teague's home at 10 o'clock at night, something Teague had never experienced in his nineteen-and-a-half years in law enforcement. As a result, Teague believed "something was very much out of place." In addition, Welch was present at the meeting during which Chief Brungardt placed Burkett on administrative leave, which Burkett testified was unusual. Further, according to departmental procedure, all cases sent to the district attorney's office for prosecution were submitted in writing with all available documentation attached. But Chief Brungardt did not submit appellees'

documented evidence concerning the Wess Jones incident to the district attorney's office; instead, the case was only verbally "run by" the district attorney.

■ Additionally, there is some evidence that appellees were treated worse than similarly situated employees. Teague was the lieutenant in charge of C.I.D. from October 1995 through January 1996. From December 1994 through October 1995, however, Byron Lake was the lieutenant in charge of C.I.D. He was in charge of C.I.D. for longer than either of appellees, and in 1995 he had been the subject of a no-confidence vote by the Town's police association.[11] Lake was not put on administrative leave because of the backlog of cases in C.I.D., however, and he was questioned by Parker–Jones for less than one day. In contrast, Burkett was questioned for seven days straight, eight or nine hours a day, plus an additional day later on. Teague was also questioned for six or seven days. Lake did not report Wess Jones's conduct to the district attorney, nor did he join in appellees' January 25, 1996 grievance against Chief Brungardt for allegedly covering up the Wess Jones investigation. Appellees were discharged, and Lake was eventually promoted to captain.

The Town asserts that appellees were treated the same as three other similarly situated employees—Greg Jones and Investigators Mary Estrello and Ron McFadden—because all three of these employees were also discharged as a result of Parker–Jones's investigation. These individuals were not all similarly situated to appellees. Only Estrello and McFadden worked in C.I.D. Greg Jones did not; he was a patrol sergeant. In addition, Greg Jones had joined appellees in reporting

Wess Jones's alleged criminal conduct to the district attorney's office.

Estrello's and McFadden's discharge is evidence that appellees were not treated worse than some other similarly situated employees. When viewed in the light of the evidence of causation as a whole, however, this evidence is not so overwhelming that the jury's finding should be set aside and a new trial ordered. *Garza*, 395 S.W.2d at 823.

■ Finally, Welch testified that appellees were discharged for "gross dereliction of duty" and because they were not providing services to the Town's citizens. Welch further testified that Burkett was discharged for insubordination because he failed to take a polygraph examination. The Parker–Jones report is some evidence to support the first two of Welch's stated reasons. Much of the evidence we have previously discussed, however, is evidence that these stated reasons were false. In addition, Burkett testified that he did not refuse to take a polygraph examination. Initially, the Town wanted Parker–Jones to give Burkett the polygraph examination. Burkett was apparently uncomfortable with this proposed arrangement because he believed Parker–Jones was participating in the cover-up of the Wess Jones investigation. Through his attorney, however, Burkett offered to work with the Town to find a neutral operator to administer the examination. Welch was involved in the conversations with Burkett's attorney to try to find a neutral examiner.

Also, though the Parker–Jones report criticized appellees because cases in C.I.D. were not being properly investigated, Burkett denied approving the closing of any cases when there were leads to follow.

11. The record does not support the Town's assertion that appellees had also been the subject of a no-confidence vote.

In addition, it was Chief Brungardt who had instructed the investigators in August 1995, before Teague was in charge of C.I.D., to follow up on whatever leads they had in their open files and then inactivate them. Georgia Hernandez, a former C.I.D. officer, confirmed this and also testified that nothing changed in the way the C.I.D. investigators worked after Nottingham replaced Teague.

Further, Chief Brungardt had let it be known early on in his administration that he considered Wess Jones to be the key to the Town's police association. Wess Jones was the association's spokesman, and Chief Brungardt informed Teague that he (Brungardt) intended to use Jones to "deliver the police association" to Chief Brungardt or to his way of thinking. Wess Jones was in Chief Brungardt's office on many occasions and participated in many closed-door meetings with him, even though Wess was only a patrol officer. Teague testified that it was unusual for a patrol officer like Wess to spend so much time in the chief's office. Teague likened Wess Jones's and Chief Brungardt's relationship to that between a private and a general.

The Town asserts that its hiring of Parker–Jones broke the chain of causation because Parker–Jones conducted an outside, independent investigation of appellees' conduct. See Long v. Eastfield College, 88 F.3d 300, 307 (5th Cir.1996); Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir.1990) (both indicating that, in Title VII cases, causal link between alleged retaliatory intent and termination may be broken if uninvolved third party makes actual decision to terminate after conducting its own independent investigation). We are not persuaded by this argument. Parker–Jones's investigation of appellees was not completely independent of the Town because Welch, the Town's attorney, participated in the Parker–Jones interviews. In addition, Parker–Jones did not make the decision to discharge appellees; Welch and Chief Brungardt did.

We hold that the evidence is legally and factually sufficient to establish that the Town would not have terminated appellees' employment when it did if appellees had not reported the Wess Jones matter to the district attorney and Chief Brungardt. See Zimlich II, 29 S.W.3d at 68; McDill, 914 S.W.2d at 723. Although there is conflicting evidence as to why appellees were discharged, the jury was free to believe some witnesses, disbelieve others, and to resolve any inconsistencies in their testimony. McGalliard, 722 S.W.2d at 697. The evidence supporting the jury's finding on causation is not so weak or the evidence to the contrary so overwhelming that the answer should be set aside and a new trial ordered. Garza, 395 S.W.2d at 823. Accordingly, there is sufficient evidence of causation to support the jury's verdict.

Based on the foregoing discussion, we overrule the Town's first, second, third, sixth, seventh, and eighth issues.

## IV. Jury Charge

In its fourth and fifth issues, the Town complains that the trial court reversibly erred by overruling the Town's objections to the jury instructions and questions and by refusing to submit the Town's proposed instructions and questions.

### A. Standard of Review

The standard of review for alleged jury charge error is abuse of discretion. Tex. Dep't of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex.1990) (op. on reh'g); Steak & Ale v. Borneman, 62 S.W.3d 898, 904 (Tex. App.-Fort Worth 2001, no pet.). Abuse of discretion occurs only when the trial court acts arbitrarily, unreasonably, or without reference to any guiding principles.

*Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986); *Borneman,* 62 S.W.3d at 904.

▮▮▮▮ The rules of civil procedure require the trial court to "submit such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX.R. CIV. P. 277. A proper jury instruction is one that assists the jury and is legally correct. *Oechsner v. Ameritrust Tex., N.A.,* 840 S.W.2d 131, 133–34 (Tex. App.-El Paso 1992, writ denied). An instruction that misstates the law or misleads the jury does not meet this standard. *White v. Liberty Eylau ISD,* 920 S.W.2d 809, 812 (Tex.App.-Texarkana 1996, writ denied). In addition, the trial court may refuse a requested instruction, even if it properly states the law, if it is not necessary to enable the jury to render a verdict. *Id.* at 811–12.

### B. Instruction on Causation

The Town requested the following instruction on causation:

> Plaintiffs Tom Teague and David Burkett each must demonstrate that there existed a "but for" causal link between making the report and their termination. In other words, Plaintiffs Tom Teague and David Burkett must each prove that without the report of violation of law (assuming that each made such a report), their termination would not have occurred when it did. An employer does not discriminate against an employee for reporting a violation of law, in good faith, to an appropriate law enforcement authority, unless the employer's action

would not have occurred when it did had the report not been made. *You are further instructed that if the Town had sufficient grounds for terminating Plaintiff Tom Teague and Plaintiff David Burkett, it cannot be liable for such termination simply because of Teague and Burkett's report of illegal conduct.* [Emphasis supplied.]

The trial court's charge to the jury included this instruction except for the italicized language.

The Town contends that the trial court erred by omitting the italicized language from the charge. We disagree. The requested instruction is a misstatement of the causation standard in whistleblower cases. The Whistleblower Act does not require an employee to prove that his reporting of illegal conduct was the sole reason for his employer's adverse actions. *Hinds,* 904 S.W.2d at 634. Instead, the standard of causation in whistleblower cases is that the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did. *Id.* at 636. The instructions that the trial court included in the charge properly stated this standard.[12] Thus, the trial court did not abuse its discretion by omitting the Town's requested instruction from the charge. *E.B.,* 802 S.W.2d at 649; *Borneman,* 62 S.W.3d at 904.

▮▮▮▮ The Town also complains that the trial court erred by not submitting the defensive *question:* "Would the Town of Flower Mound have terminated Plaintiff Tom Teague[/David Burkett] without consideration of Plaintiff's 'whistleblowing' activity, if any such activity occurred?" This

---

12. The Town relies on *McDill* to support its contention that the trial court should have included the Town's requested language in the charge. 914 S.W.2d at 724. The Town's reliance on *McDill* is misplaced, however, because the Town's requested instruction is different from the one in *McDill.* In fact, the instruction that the *McDill* court concluded was proper was virtually identical to another instruction the court in this case included in its charge. *See id.*

is an inferential rebuttal defense.[13] Under Rule 277, inferential rebuttal defenses "shall not be submitted in the charge." Tex.R. Civ. P. 277. If properly raised by the evidence, however, such defenses may be presented to the jury in an instruction, which is what the trial court did in this case.[14] *Id.; see also La.-Pac. Corp. v. Knighten,* 976 S.W.2d 674, 676 (Tex.1998). Thus, the trial court did not abuse its discretion in refusing to submit the Town's defensive issue as a jury question.

### C. Instruction on Appropriate Law Enforcement Authority

The Town asserts that the trial court erred in refusing to include the Town's requested instruction on what constitutes an appropriate law enforcement authority. According to the Town, the trial court should have determined as a matter of law that the Town manager was not an appropriate law enforcement authority under the Act. For the reasons stated above,[15] we hold that the trial court did not err by refusing to instruct the jury on who is a proper law enforcement authority.

### D. Instruction on Adverse Personnel Action

■ The Town contends that the trial court erred by not including the Town's requested definition of "adverse personnel action" and that, as a result, the jury was free to consider whether appellees' being placed on administrative leave with pay was an adverse personnel action. The court's charge defines "personnel action" as "an action that affects a public employee's compensation, promotion, demotion, transfer, work assignment, or performance evaluation." This definition is a direct quote of the statutory definition. Tex. Gov't Code Ann. § 554.001(3).

■ When a statute defines a term, a court is bound to construe that term by its statutory definition only. *Needham,* 82 S.W.3d at 318. The Town's requested definition did not track the statutory language, so the trial court did not err by refusing to include it. In addition, we believe the term "adverse" is so common that no definition was required to enable the jury to render a verdict. *See* Tex.R. Civ. P. 277.

The Town's real complaint seems to center around the trial court's refusal to affirmatively instruct the jury that the placing of appellees on administrative leave with pay was not an adverse personnel action.[16] The only question that the jury was asked

---

13. An inferential rebuttal issue is one that seeks to disprove the existence of an essential element submitted in another issue. Its basic characteristic is that it presents a contrary or inconsistent theory from the claim relied upon for recovery. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer,* 988 S.W.2d 750, 752 (Tex.1999).

14. The trial court instructed the jury as follows:

You are instructed that if the Town of Flower Mound would have taken the same action with respect to Plaintiffs Tom Teague and/or David Burkett without consideration of Plaintiffs' "whistleblowing" activity, if any such activity occurred, then the Town of Flower Mound may not be held liable for

any violation of the Texas Whistleblower Act, including the retaliation referred to in these questions.

15. *See* p. 755 herein.

16. The Town's proposed instruction was as follows:

You are instructed that the term "adverse personnel action" must be an action which is an ultimate employment decision that affects the terms and conditions of employment, and which causes some injury or harm to the Plaintiff such as discharge, demotion, refusing to hire or promote, or a reprimand, or a decision constituting a change in benefits, or reassignment. *There*

to decide, however, was whether the Town's decision to *terminate* appellees' employment was the result of appellees' reporting of alleged violations of law. Because the jury was not asked to decide whether the placing of appellees on administrative leave was an adverse personnel action, the trial court did not abuse its discretion by refusing to include this instruction.

### E. Instruction on Rebuttable Presumption

 The trial court instructed the jury that:

> The Whistleblower Act specifies that there is a presumption that a report of a violation of law, if any, caused the retaliatory conduct about which Plaintiffs Tom Teague and David Burkett complain, if the retaliatory conduct occurred within ninety days of the report of the violation of law. That presumption is rebuttable by the Town of Flower Mound, if you find that the alleged retaliatory conduct was justified based upon the stated reasons given by the Town of Flower Mound for the action(s) taken.

The Town requested that the following sentence be added to the instruction: "You are instructed that, since Plaintiffs Tom Teague and David Burkett were each terminated from employment more than ninety days from their alleged report of a violation of law, this presumption of causation is not available as to Plaintiffs' unlawful termination claim." When the trial court refused to add this sentence, the

Town objected that the instruction did not "adequately advise a jury of the law applicable to this case" and would therefore cause the rendition of an improper verdict.

On appeal, the Town complains that the instruction as given constituted an improper comment on the weight of the evidence and did not properly place the burden of proof. The Town also complains that the instruction probably caused the rendition of an improper verdict because it allowed the jury to presume that the timing of appellees being placed on administrative leave with pay, rather than their discharge, was sufficient retaliatory conduct "to establish this element of their claim."

These complaints are waived because they were not raised below. *See* Tex. R.App. P. 33.1(a). In addition, as we have previously noted, the jury was not asked to decide whether the Town retaliated against appellees by placing them on administrative leave with pay; the jury was only asked whether the Town retaliated against appellees by terminating their employment.

### F. Town's Proposed Instructions

 The Town contends that the trial court erred in failing to submit the following liability issue: "Do you find from a preponderance of the evidence that Tom Teague[/David Burkett] in good faith reported a violation of law to an appropriate law enforcement authority which caused the Town of Flower Mound to terminate his employment?"[17] If submitted, this is-

---

*is evidence that Plaintiffs Tom Teague and David Burkett were placed on administrative leave with pay, and you are instructed that such action does not constitute "suspension" or "adverse personnel action" under the Whistleblower Act. [Emphasis supplied.]*

**17.** Regarding liability, the charge asked the jury:

> Was the Town of Flower Mound's decision to terminate the employment of Tom Teague because of Tom Teague's good faith allegations, if any, against Wess Jones and his complaint against Chief Burngardt [sic] for the alleged Wess Jones cover-up?

The charge included an identical liability question regarding Burkett. The only objection that the Town made to these liability

sue would have required the jury to answer the following questions: (1) whether a public employee reported a violation of law; and (2) whether the report was made to an appropriate law enforcement authority. The questions of whether the report was about a violation of law or made to an appropriate law enforcement authority are questions of law and should not be submitted to a jury. *See Needham,* 82 S.W.3d at 318; *Rogers,* 89 S.W.3d at 274; *Knutson v. Ripson,* 346 S.W.2d 424, 426 (Tex.Civ. App.-Amarillo 1961), *aff'd,* 163 Tex. 312, 354 S.W.2d 575 (1962); *Jones v. Winter,* 215 S.W.2d 654, 656 (Tex.Civ.App.-Amarillo 1948, writ ref'd n.r.e.). Therefore, the trial court did not abuse its discretion in refusing to submit the requested issue.

### G. Jury Questions on Damages and Attorney's Fees

■■■ In three sentences, the Town complains that the trial court erred by submitting damages questions to the jury because there was insufficient evidence to warrant submission of these questions. The Town does not explain why the evidence was insufficient, nor does it cite any legal authority to support its position. We are not required to search a voluminous record, with no guidance from the Town, to discover possible trial court error. *See Harkins v. Dever Nursing Home,* 999 S.W.2d 571, 573 (Tex.App.-Houston [14th Dist.] 1999, no pet.); *Hall v. Stephenson,* 919 S.W.2d 454, 467 (Tex.App.-Fort Worth 1996, writ denied). Accordingly, this complaint is waived, and we will not address it. *See Fredonia State Bank v. Gen. Am. Life Ins. Co.,* 881 S.W.2d 279, 284 (Tex.1994) (citing long-standing rule that a point may be waived due to inadequate briefing).

· The Town also contends that appellees' question on attorney's fees should not have been submitted because the evidence is legally and factually insufficient to support appellees' whistleblower claims. As we have previously discussed, however, the evidence is legally and factually sufficient.[18] We overrule the Town's fourth and fifth issues.

### V. Judgment

■■■ In its eleventh issue, the Town complains that the trial court's judgment does not conform to the jury's verdict. *See* TEX.R. CIV. P. 301. The Town attacks the recitation in the judgment that the jury found that the Town terminated appellees' employment because appellees "reported violations of law by Town of Flower Mound employees to an appropriate law enforcement authority." The Town complains that the jury found that the Town's decision to terminate appellees' employment was because of their good faith allegations against Wess Jones and Chief Brungardt, but that the jury did not find appellees reported a violation of law to an appropriate law enforcement authority.

We have held that the evidence sufficiently supports the verdict against the Town on appellees' whistleblower claims. The judgment conforms to the verdict. Accordingly, we overrule the Town's argument that the judgment does not conform to the verdict.

■■■ The Town also complains of the recitation in the judgment that a jury was duly empaneled "consisting of twelve good and lawful jurors." The Town contends that it had an insufficient basis for knowing whether the jurors were "good and lawful" and that the rules of civil proce-

---

questions was that they did not ask whether appellees made their report to an appropriate law enforcement authority. For the reasons stated above, the trial court did not err in overruling this objection.

18. *See* pp. 752–58 herein.

dure only require jurors to be qualified. This argument is patently without merit and is, therefore, overruled.

## A. Prejudgment Interest

■ The Town also asserts that the trial court included the incorrect amount of prejudgment interest in the judgment. Prejudgment interest is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment. *Johnson & Higgins v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998); *Taylor Foundry Co. v. Wichita Falls Grain Co.*, 51 S.W.3d 766, 775 (Tex. App.-Fort Worth 2001, no pet.). The Supreme Court of Texas has held that, under the common law, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date the suit is filed. *Johnson & Higgins*, 962 S.W.2d at 531.

In adopting this rule, the supreme court conformed the common law to the legislative policy established in chapter 304 of the finance code. *Id.* at 528 & n. 9; *see also* TEX. FIN.CODE ANN. §§ 304.101, .104 (Vernon Supp.2003) (providing that, in wrongful death, personal injury, and property damage cases, prejudgment interest accrues "beginning on the earlier of the 180th day after the date the defendant receives written notice of a claim or *the date the suit is filed* and ending on the day preceding the date judgment is rendered") (emphasis supplied). The supreme court's purpose was to restore uniformity to the law of prejudgment interest. *Johnson & Higgins*, 962 S.W.2d at 533.

In this case, appellees first filed their whistleblower lawsuit in federal district court on April 18, 1996. That suit was later dismissed, and appellees refiled their whistleblower lawsuit in state court in February 1998. The Town contends that the date the federal suit was filed does not control because "the date the suit is filed" refers only to the suit in which prejudgment interest is actually awarded. Conceding that it received notice of appellees' claim "in March of '96," the Town contends that prejudgment interest began accruing 180 days later, in September 1996. Conversely, appellees contend, and the trial court ruled, that prejudgment interest began accruing on April 18, 1996, when appellees filed their whistleblower lawsuit in federal court. This is an issue of first impression.[19]

We look to the legislative intent behind section 304.104 for guidance in determining what this phrase means. In interpreting a statute, we look to the intent of the legislature as expressed in the language of the statute. *Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex.2000); *Hodges v. Thompson*, 932 S.W.2d 717, 719 (Tex.App.-Fort Worth 1996, no writ). We consider first the statute's plain and common meaning and presume that the legislature intended the plain meaning of its words. *Fleming Foods v. Rylander*, 6 S.W.3d 278, 282, 284 (Tex.1999); *see also* TEX. GOV'T CODE ANN. § 312.002(a) (Vernon 1998) (providing that words in statutes shall be given their ordinary meaning).

**19.** The Amarillo Court of Appeals has held that the trial court has the discretion to award prejudgment interest from the date suit is filed in federal court. *Excel Corp. v. Apodaca*, 51 S.W.3d 686, 701–02 (Tex.App.-Amarillo 2001), *rev'd on other grounds*, 81 S.W.3d 817 (Tex.2002). The issue before the Amarillo court, however, was whether the trial court abused its discretion by awarding prejudgment interest for periods of delay caused by the plaintiff's filing of his lawsuit in federal court. *Id.* at 701. The meaning of "the date the suit is filed" was not an issue in *Apodaca*.

Words and phrases are to be read in context and construed according to the rules of grammar and common usage. TEX. GOV'T CODE ANN. § 311.011(a). We must also presume that the legislature used every word of a statute for a purpose, and we must give effect to every sentence, clause, phrase, and word if reasonably possible. *Cities of Austin, Dallas, Fort Worth & Hereford v. S.W. Bell Tel. Co.*, 92 S.W.3d 434, 442 (Tex.2002); *Eddins–Walcher Butane Co. v. Calvert*, 156 Tex. 587, 298 S.W.2d 93, 96 (1957); *Reames v. Police Officers' Pension Bd.*, 928 S.W.2d 628, 632 (Tex.App.-Houston [14th Dist.] 1996, no writ).

"The" is a function word used to indicate that a following noun or noun equivalent is definite or has been previously specified by context or circumstance, or is a unique or particular member of its class. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1221 (10th ed.1994). Applying the ordinary meaning of "the" and presuming that the legislature used it immediately preceding "suit" for a purpose, we conclude that the legislature intended "the date *the* suit is filed" to refer to the filing of a particular lawsuit—the one in which judgment is rendered—not the filing of a lawsuit in general. This construction also makes sense when read in context with the rest of section 304.104, which provides that "prejudgment interest accrues on the amount of a judgment during the period beginning on ... the date the suit is filed and ending on the day preceding the date judgment is rendered." TEX. FIN.CODE ANN. § 304.104.

We hold that the trial court erred by awarding appellees prejudgment interest from the date they filed their federal whistleblower lawsuit because the federal suit is not the suit in which the judgment in this case was rendered. Consequently, the trial court should have awarded prejudgment interest from 180 days after the date the Town admittedly received written notice of appellees' claim in March 1996. *See Johnson & Higgins*, 962 S.W.2d at 531; *see also* TEX. FIN.CODE ANN. § 304.104.[20]

## B. Attorney's Fees

The Town's final argument in its eleventh issue is that the trial court improperly calculated appellees' attorney's fees. The jury found that appellees' reasonable attorney's fees were twenty-five percent of their "recovery." The trial court's judgment awards appellees attorney's fees in an amount equal to twenty-five percent of their damages awards and prejudgment interest. The Town asserts that the jury would have understood the term "recovery" as referring solely to the damages that the jury awarded and that appellees were, therefore, only entitled to attorney's fees in an amount equal to twenty-five percent of their damages awards. The Town cites no legal authority to support its position.

The award of attorney's fees equal to twenty-five percent of appellees' damages plus prejudgment interest is proper based on the type of jury question submitted in this case. *See St. Paul Surplus Lines Ins. Co. v. Dal–Worth Tank Co.*, 917 S.W.2d 29, 63 (Tex.App.-Amarillo 1995) (affirming, based on similar jury question, attorney's

---

**20.** The Town also complains that the "type" of calculation the trial court used to arrive at prejudgment interest was improper. If this is a complaint about the rate of prejudgment interest, we note that prejudgment interest accrues at the same rate as post-judgment interest and is to be computed as simple interest. *Johnson & Higgins*, 962 S.W.2d at 532. The Town does not explain how the trial court used an incorrect interest rate when it originally calculated appellees' prejudgment interest, and we are confident that the trial court will apply the proper interest rate on remand.

fee award that included prejudgment interest), *aff'd in pertinent part,* 974 S.W.2d 51 (Tex.1998); *see also Johnson & Higgins,* 962 S.W.2d at 528–29 (stating that prejudgment interest is compensation allowed by law as additional damages and is necessary to fully compensate injured plaintiffs). Therefore, the trial court did not err in basing the attorney's fees award on appellees' damages plus prejudgment interest.

We sustain the portion of the Town's eleventh issue in which it complains of the date used to mark the beginning of the accrual of prejudgment interest. We overrule the remainder of the Town's eleventh issue.

## VI. Town's Evidentiary Complaints

### A. Charts

■ In its tenth issue, the Town complains that the trial court improperly overruled the Town's objections to appellees' charts on damages and a time-line of events because those charts were not relevant and were not properly authenticated. At trial, the Town did not object to either of these charts based on lack of authentication. Accordingly, this complaint is waived on appeal. *See* Tex.R.App. P. 33.1(a).

The trial court overruled the Town's objection based on relevance prior to opening arguments, but the Town does not direct us to a place in the record where appellees used the charts during their opening statement, nor does the Town explain how the charts were irrelevant to appellees' case. Thus, the Town's relevance complaint is waived due to inadequate briefing. *Fredonia State Bank,* 881 S.W.2d at 284; *Harkins,* 999 S.W.2d at 573. In addition, we note that the trial court sustained the Town's objections to the time-line chart during trial and the Town did not reurge its relevance objection when appellees offered the chart on damages into evidence.

*See Richardson v. Green,* 677 S.W.2d 497, 501 (Tex.1984).

### B. Chief Brungardt

■ The Town also contends that the trial court improperly overruled its objections to evidence about whether Chief Brungardt objected to Teague's investigation of Wess Jones because this evidence is hearsay, irrelevant, and prejudicial. The complaints of irrelevance and prejudice are waived because they were not raised at trial. *See* Tex.R.App. P. 33.1(a).

■ Regarding the Town's hearsay complaint, Chief Brungardt was the Town's agent or employee, and his authorization of Teague's investigation into the Wess Jones incident was in the course and scope of his employment as chief of police. Accordingly, Teague's testimony that Chief Brungardt did not object to Teague's investigation of Wess, but actually authorized it, was an admission by a party-opponent and was not hearsay. *See* Tex.R. Evid. 801(e)(2)(D); *see also Excel Corp. v. Porras,* 14 S.W.3d 307, 314 n. 1 (Tex.App.-Corpus Christi 1999, pet. denied) (holding that statement is admission by party-opponent if made by party's agent or servant concerning matter within course and scope of the agency or employment and made during existence of agency or employment relationship); *McEwen v. Wal–Mart Stores, Inc.,* 975 S.W.2d 25, 28 (Tex.App.-San Antonio 1998, pet. denied) (stating same).

### C. Damages Evidence

■ Next, the Town complains that the trial court improperly overruled the Town's objections to appellees' damages evidence based on lack of foundation. The Town's objections that were overruled were merely general objections to "lack of foundation" that did not specify how the

evidence lacked foundation. These objections did not preserve error because they were not specific. TEX.R. EVID. 103(a)(1); *Seymour v. Gillespie,* 608 S.W.2d 897, 898 (Tex.1980); *In re Bates,* 555 S.W.2d 420, 432 (Tex.1977). The Town also complains, without elaboration, that "the jury's damages are excessive, and are not supported by admissible evidence." This complaint is waived because it is not briefed. TEX. R.APP. P. 38.1(h); *Fredonia State Bank,* 881 S.W.2d at 284.

### D. Exclusion of Town's Expert

 The Town also asserts that the trial court improperly excluded the Town's expert on liability from the courtroom under the exclusionary rule. *See* TEX.R. EVID. 614; TEX.R. CIV. P. 267. Expert witnesses are not automatically exempt from the Rule. *Drilex Sys., Inc. v. Flores,* 1 S.W.3d 112, 118 (Tex.1999). The Town bore the burden of establishing that its expert was exempt from exclusion based on one of the exceptions in the Rule. *Id.* at 117, 119. The Town offered no such evidence; therefore, the trial court did not err by placing the Town's expert under the Rule.

### E. Appellees' Jury Argument

 The Town complains that appellees' counsel made incurable jury argument during closing argument by referring to a police "code of silence" and by referring to appellees' future earnings and benefits that were unsupported by the evidence. This complaint is waived because the Town does not cite any legal authority to support it. TEX.R.APP. P. 38.1(h); *Fredonia State Bank,* 881 S.W.2d at 284. The Town's complaint that the trial court improperly polled the jury is waived because

the Town did not raise this complaint in the trial court. *See* TEX.R.APP. P. 33.1(a).

We overrule the Town's tenth issue.[21]

### VII. Errors in Reporter's Record

 In its twelfth and final issue, the Town contends that it is entitled to a new trial because the court reporter failed to accurately record the proceedings in this cause. The Town raises the same arguments in this issue that it raised in its "Objections to Reporter's Record, Motion to Abate Appeal, and Motion to Correct Reporter's Record," which the Town filed simultaneously with its appellate brief. We considered and ruled on those arguments when we granted the Town's motion in part and abated the appeal for correction of the record. Since that time, a corrected reporter's record has been filed. The Town now contends that some of the necessary corrections still have not been made and expresses concern about what matters may be missing from the reporter's record.

An appellant is not entitled to a new trial unless the lost, destroyed, or inaudible portion of the reporter's record "is necessary to the appeal's resolution." TEX. R.APP. P. 34.6(f)(3). The Town does not explain how the alleged uncorrected errors are necessary to resolution of the appeal; thus, the Town has not met its burden under Rule 34.6.

Citing *Gillen v. Williams Brothers Construction Co.,* 933 S.W.2d 162, 164 (Tex. App.-Houston [14th Dist.] 1996, writ denied), the Town asserts that Rule 34.6 does not require it to demonstrate harm from having an incomplete record. We decline to apply *Gillen* to this situation, however, because *Gillen* is based on former Rule

---

21. In light of our holdings with regard to the Town's first, second, fourth, fifth, and tenth issues, we need not consider the Town's ninth issue, in which it complains that the trial court improperly overruled its motion for new trial.

50(e), which did not take into consideration whether the lost, destroyed, or inaudible portion of the reporter's record was necessary to resolution of the appeal.[22] We overrule the Town's twelfth issue.

## VIII. Conclusion

Having disposed of all of the Town's issues, we reverse the trial court's award of prejudgment interest and remand that issue to the trial court for a recalculation of prejudgment interest consistent with this opinion. We affirm the remainder of the trial court's judgment.

---

**22.** Former Rule 50(e) provided, in pertinent part: "If the appellant has made a timely request for a statement of facts, but the court reporter's notes and records have been lost or destroyed without appellant's fault, the appel- lant is entitled to a new trial unless the parties agree on a statement of facts." Tex.R.App. P. 50(e), 707–708 S.W.2d (Tex.Cases) LXII–III (1986, revised 1997).