**Affirmed in Appellate Case No. 14-23-00348-CV; Affirmed in Appellate Case No. 14-23-00672-CV; Reversed and Remanded in Appellate Case No. 14-23-00736-CV; and Memorandum Opinion filed August 27, 2024.**



**In The**

# Fourteenth Court of Appeals

---

**NO. 14-23-00348-CV**
**NO. 14-23-00672-CV**
**NO. 14-23-00736-CV**

---

**HARRIS COUNTY, Appellant**

**V.**

**JERRY LUMAN, NORMAN VERBOSKY, AND DAVID WILLIAMS,**
**Appellees**

---

**DWAYNE PACIFICO, MARY ANN CARRION, AND CINDY VARA-LEIJA, Appellants**

**V.**

**HARRIS COUNTY, Appellee**

---

**JERRY  LUMAN, Appellant**

**V.**

**On Appeal from the 333rd District Court**
**Harris County, Texas**
**Trial Court Cause Nos. 2019-38876 & 2019-38876A**

## M E M O R A N D U M   O P I N I O N

Jerry Luman, Norman Verbosky, David Williams, Mary Ann Carrion, Cindy Vara-Leija, and Dwayne Pacifico asserted individual whistleblower claims against Harris County, alleging that they each suffered adverse employment consequences after reporting violations of law occurring within the Harris County Precinct 2 Constable's office. Harris County filed combined motions for summary judgment and pleas to the jurisdiction challenging each plaintiff's claim, arguing that the plaintiffs could not raise an issue of fact with respect to the elements necessary to establish their claims under the Texas Whistleblower Act. *See* Tex. Gov't Code Ann. §§ 554.001-554.010.

The trial court signed three interlocutory orders denying Harris County's pleas to the jurisdiction with respect to the claims asserted by Luman, Verbosky, and Williams. Harris County appealed and, for the reasons below, we affirm the trial court's interlocutory orders.

The trial court signed an interlocutory order granting Harris County's summary judgment motion with respect to Luman's whistleblower claim. The trial court later severed, making this a final summary judgment, which Luman appealed. We reverse this final judgment and remand that cause for further proceedings.

Finally, the trial court signed three interlocutory orders granting Harris County's pleas to the jurisdiction with respect to the claims asserted by Carrion,

Vara-Leija, and Pacifico, who filed appeals. Because Carrion, Vara-Leija, and Pacifico did not meet the applicable evidentiary burdens, the trial court did not err in concluding it lacked jurisdiction over their whistleblower claims. We affirm the trial court's interlocutory orders granting these pleas to the jurisdiction.

## BACKGROUND

### *Relevant Facts*

The facts of these appeals are more akin to a television drama than a typical civil matter.[1] The story is set in the Harris County Precinct 2 Constable's office ("HCCO-2") and begins with two central characters: Constable Diaz and Kimberly Bellotte.

Constable Diaz and Bellotte worked together for approximately 20 years before the inception of the facts giving rise to this litigation. Prior to their stints with HCCO-2, Constable Diaz and Bellotte worked together at the City of San Jacinto, with Constable Diaz serving as the mayor and Bellotte working as the director of parks and recreation. After Constable Diaz was elected as constable, Bellotte joined the HCCO-2 staff as a clerk. Bellotte served as a clerk for one month before she was promoted to chief clerk.

Bellotte held the position of chief clerk for approximately four years before attending the University of Houston Police Academy. Bellotte graduated from the Police Academy in May 2017 and returned to HCCO-2 commissioned as a senior lieutenant.

In November 2017, Luman (the then-chief of HCCO-2) and Williams (then-

---

[1] The facts discussed below are relevant to the whistleblower claims asserted by Luman, Verbosky, Williams, Carrion, and Vara-Leija. Because the facts underlying Pacifico's claim are different, we discuss them later in the opinion.

serving as a lieutenant) received several Freedom of Information Act[2] open records requests. The requests sought documentation on the timecards for all HCCO-2 employees (particularly those belonging to Bellotte) and inventory logs and final disposition information pertaining to Hurricane Harvey donations. In the process of responding to the requests, Luman and Williams discovered that there were several irregularities with respect to certain overtime payments made to Bellotte. Luman and Williams relayed their concerns to the Harris County Attorney's Office.

The Texas Rangers opened an investigation into the reported irregularities and, in February 2018, Ranger Parker met with Luman, Williams, and Verbosky (the then-assistant chief of HCCO-2). Luman told Ranger Parker that, in responding to the information requests, it was noted that Bellotte's "time sheets reflected she earned an overtime amount that was noticeably higher than the other commissioned staff." Specifically, Bellotte's time sheets indicated she worked "several consecutive 24 hours days during the Hurricane Harvey time frame." Luman told Ranger Parker that it was also discovered that Bellotte was classified as a "non-exempt" employee, which permitted her to earn overtime. At this time, it was uncommon for a commissioned law enforcement officer with supervisory duties to carry a non-exempt status.

Luman and Verbosky stated that they were Bellotte's supervisors but did not instruct or permit her to work these hours during Hurricane Harvey. Continuing on, Luman and Verbosky described Bellotte as "difficult to manage" and said she "exhibited characteristics of inexperience." Luman and Verbosky were unable to explain why Bellotte was placed in a senior management position over other officers with more experience.

---

[2] *See* 5 U.S.C.A. § 552.

Luman and Verbosky relayed to Ranger Parker that they also had concerns regarding Bellotte's involvement with inventorying and distributing Hurricane Harvey donations. Luman stated that other deputies had told him Bellotte "had taken a large amount of the donations" to her home. Bellotte also had been seen distributing some of the donations at the HCCO-2 office, including food and boots.

Williams told Ranger Parker that he asked Bellotte about logging the Hurricane Harvey donations, but Bellotte "told him that she had not recorded anything with regard to the donations." Williams said Bellotte also obtained "a large amount of dry fit shirts" that were subsequently printed with the HCCO-2 constable badge and distributed at community events.

Ranger Parker subsequently met with members of the Harris County Auditor's office to further inquire into Bellotte's status as a non-exempt employee. Ranger Parker noted that, when Bellotte originally was hired as a clerk in May 2013, she was designated as an "exempt" employee. After she was commissioned as a senior lieutenant, Bellotte submitted a "Change in Status of Employee" form, changing her status to "non-exempt." Bellotte signed the form on the line designated "Employer Authorization" and left blank the line designated "Employee Signature." Reviewing this evidence, Ranger Parker reached two conclusions:

2.12 Matter-of-factly, the form reflected Lieutenant Bellotte authorized her own change in status, which allowed her to make overtime. Constable Diaz's required signature did not appear anywhere on the form.

2.13 This investigation indicated that the standard for Commissioned Harris County Peace Officers who carried the rank of Lieutenant and above to be classified as 'exempt' employees.

The audit further showed that Bellotte "was the only commissioned Peace Officer from the rank of Lieutenant and above to receive regular overtime payment."

Bellotte received approximately $20,000 in overtime payments in 2017.

Ranger Parker subsequently met with then-chief clerk Carrion and then-sergeant Vara-Leija. Vara-Leija told Ranger Parker that she observed Hurricane Harvey donations at the HCCO-2 office. Vara-Leija relayed that she saw Bellotte bring "a large box of boots to the office and offer[] the boots to several of the deputies." Vara-Leija said she declined the boots because "she was suspicious of [their] origin." Vara-Leija also stated that she "observed a large amount of cookies, crackers, and diapers at the Constable's Office."

Carrion told Ranger Parker she assisted Bellotte in submitting the "Change in Status of Employee" form in 2017. Carrion said Constable Diaz was not present when the form was submitted but it "was common that anything from Diaz 'always goes to [Bellotte].'" With respect to the donations, Carrion "advised she knew Lieutenant Bellotte had taken some of the donations to her house to give to her neighbors."

The Texas Rangers' report on the matter was made public in February 2019, with the publication of an online article entitled, "Report: Former Constable Lt. Stole from Harvey Victims and Taxpayers."[3] The article contains a link to the entirety of the Texas Rangers' report. After its publication, Constable Diaz asked Luman to bring him a copy of the report. Constable Diaz also met with the owner of a local newspaper, who questioned him regarding the report's contents.

Luman, Verbosky, Williams, Carrion, and Vara-Leija assert that, after Constable Diaz became aware of their involvement in the Texas Rangers' investigation, he engaged in a pattern of retaliatory acts. These actions culminated in Luman's and Verbosky's terminations and the resignations of Williams,

---

[3] *See* https://texasscorecard.com/local/report-former-constable-lt-stole-from-harvey-victims-and-taxpayers/ (last accessed August 20, 2024).

Carrion, and Vara-Leija.

*Legal Proceedings*

Luman, Verbosky, Williams, Carrion, Vara-Leija, and Pacifico sued Harris County, asserting claims under the Texas Whistleblower Act. *See* Tex. Gov't Code Ann. §§ 554.001-554.010. For each individual plaintiff, Harris County filed a combined plea to the jurisdiction and traditional and no-evidence summary judgment motion, asserting that (1) the trial court lacked subject-matter jurisdiction over the asserted whistleblower claim, and (2) the plaintiff could not produce any evidence to support the claim. Each plaintiff filed a response.

The trial court signed three interlocutory orders denying Harris County's pleas to the jurisdiction with respect to Luman, Verbosky, and Williams. In separate orders, the trial court also denied Harris County's combined summary judgment motions challenging the claims asserted by Verbosky and Williams. Harris County timely appealed the interlocutory denials of its pleas to the jurisdiction.[4]

The trial court signed an order granting Harris County's summary judgment motion with respect to Luman's claim. The trial court granted Luman's motion to sever his claim against Harris County from those of the other plaintiffs. Luman timely appealed from this final judgment.[5]

The trial court signed three interlocutory orders granting Harris County's pleas to the jurisdiction with respect to the claims asserted by Carrion, Vara-Leija, and Pacifico. Carrion, Vara-Leija, and Pacifico timely appealed the interlocutory

---

[4] Trial court cause number 2019-38876; appellate case number 14-23-00348-CV.

[5] Trial court cause number 2019-38876A; appellate case number 14-23-00736-CV.

7

orders.[6]

Given their shared factual background and the similarity of the asserted claims, we consolidate these appeals for purposes of our opinion and dispose of them simultaneously.

## ANALYSIS

Our review begins with the trial court's denial of Harris County's pleas to the jurisdiction with respect to Luman, Verbosky, and Williams. Because these plaintiffs produced evidence sufficient to support their whistleblower claims at this stage of the proceedings, we conclude the trial court did not err in denying Harris County's pleas to the jurisdiction. For this reason, we also hold that the trial court erred in granting Harris County's combined no-evidence and traditional motions for summary judgment on Luman's whistleblower claim.

We next address the trial court's orders granting Harris County's pleas to the jurisdiction with respect to the whistleblower claims asserted by Carrion, Vara-Leija, and Pacifico. Because these plaintiffs did not meet their evidentiary burden at this stage of the litigation, the trial court did not err in granting Harris County's pleas.

## I.     Standard of Review

Counties, as political subdivisions of the state, have governmental immunity from suits for damages unless that immunity has been waived. *City of Houston v. Houston Mun. Emps. Pension Sys.*, 549 S.W.3d 566, 576 (Tex. 2018). A county may assert its immunity in a plea to the jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004).

A plea to the jurisdiction presents a question of law we review *de novo*, thus

---

[6] Trial court cause number 2019-38876; appellate case number 14-23-00672-CV.

mirroring the standard applied to a traditional summary judgment motion. *Tex. Health & Human Servs. Comm'n v. Pope*, 674 S.W.3d 273, 280-81 (Tex. 2023). When a plea to the jurisdiction challenges the existence of jurisdictional facts, "we must move beyond the pleadings and consider evidence when necessary to resolve the jurisdictional issue, even if the evidence implicates both subject-matter jurisdiction and the merits of a claim." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770-71 (Tex. 2018).

A defendant filing a plea to the jurisdiction has the initial burden of proving as a matter of law that the trial court lacks jurisdiction; if it does so, the plaintiff must "show that a disputed material fact exists regarding the jurisdictional issue." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012). When a fact issue exists, the plea to the jurisdiction is properly denied. *Id.* If the plaintiff fails to raise a fact question on the jurisdictional issue or the relevant evidence supporting the assertion of immunity is undisputed, the plea to the jurisdiction must be granted as a matter of law. *Id.*

In determining whether a material fact issue exists, we take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor. *Alamo Heights Indep. Sch. Dist.*, 544 S.W.3d at 771. In doing so, "we cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not." *Id.*

## II.     Governing Law

When pursuing a claim under the Texas Whistleblower Act, a plaintiff must allege jurisdictional facts giving rise to an actual violation of the Act to qualify for the statutory waiver of immunity. *Tex. Health & Human Servs. Comm'n*, 674 S.W.3d at 280; *see also* Tex. Gov't Code Ann. §§ 554.003(a) (authorizing suit by a

9

public employee terminated in violation of the Act), 554.0035 (waiving immunity "to the extent of liability for the relief allowed under this chapter for a violation of this chapter").

The Act prohibits adverse personnel action against "a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." Tex. Gov't Code Ann. § 554.002. A public employee who sues under the Act bears the burden of proof. *Id*. § 554.004(a). Accordingly, to maintain a whistleblower claim under the Act, the employee must show that he (1) reported (2) a violation of law by the employer or another public employee (3) to an appropriate law enforcement authority, (4) the report was made in good faith, and (5) the adverse action would not have occurred when it did but for the employee's report. *Id*. § 554.002(a); *City of Fort Worth v. Pridgen*, 653 S.W.3d 176, 182 (Tex. 2022).

To constitute a "report" under the Act, a public employee "must convey information that exposes or corroborates a violation of law or otherwise provide relevant, additional information that will help identify or investigate illegal conduct." *Pridgen*, 653 S.W.3d at 184. Moreover, because "corroboration is eminently valuable when evaluating the reliability of an informant's tip," the Act is not limited to the initial report of illegal conduct but also protects subsequent reports regarding the same conduct. *Id*. at 185-86.

To report a "violation of law" under the Act, the employee must allege a violation of a state or federal statute, an ordinance of a local governmental entity, or a rule adopted under a statute or ordinance. Tex. Gov't Code Ann. § 554.001(1).

The third element requires that the report be made to "an appropriate law enforcement agency," which refers to an entity that has "authority to enforce,

investigate, or prosecute violations of law against third parties outside of the entity itself, or it must have authority to promulgate regulations governing the conduct of such third parties." *Univ. of Tex. Sw. Med. Ctr. at Dallas v. Gentilello*, 398 S.W.3d 680, 686 (Tex. 2013). The entity's power to "enforce" or "regulate under" must pertain to "the law alleged to be violated in the report." Tex. Gov't Code Ann. § 554.002(b)(1).

The fourth element's "good faith" requirement has both subjective and objective prongs and modifies all the Act's components. *Pridgen*, 653 S.W.3d at 184 n.5; *Univ. of Houston v. Barth*, 403 S.W.3d 851, 856 (Tex. 2013). An employee reports "in good faith" when (1) the employee believes he is reporting conduct that constitutes a violation of law, and (2) the employee's belief is reasonable in light of the employee's training and experience. *Univ. of Houston*, 403 S.W.3d at 856. The reasonableness of a law enforcement officer's belief that a law has been violated will be examined more closely than the belief of one in a non-law enforcement profession. *Harris Cnty. Precinct Four Constable Dep't v. Grabowski*, 922 S.W.2d 954, 956 (Tex. 1996) (per curiam).

Finally, the employee must show that the adverse employment action would not have occurred when it did but for the employee's report. *See* Tex. Gov't Code Ann. § 554.002(a); *see also City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000); *Houston Indep. Sch. Dist. v. Florez*, No. 14-22-00153-CV, 2023 WL 413573, at *3 (Tex. App.—Houston [14th Dist.] Jan. 26, 2023, no pet.) (mem. op.). The Act permits a rebuttable presumption of a causal connection if the employee is terminated not later than 90 days after the reported violation of law. *See* Tex. Gov't Code Ann. § 554.004(a); *Houston Indep. Sch. Dist.*, 2023 WL 413573, at *3. But this presumption does not shift the burden of proof; rather, it stands only in the absence of evidence to the contrary. *Houston Indep. Sch. Dist.*, 2023 WL 413573,

11

at *3. "Once sufficient evidence is produced to support a finding of the nonexistence of the causal connection between the termination and the reported violation of law, the presumption is rebutted, and the case then proceeds as if no presumption ever existed." *Id.* (internal quotation omitted).

If the presumption is rebutted, the employee must produce some evidence to support the alleged causal connection. *Id.* at *4. "An employee need not prove that his reporting of the illegal conduct was the sole reason for the alleged adverse action and circumstantial evidence may be sufficient to establish this causal link." *Id.* Relevant circumstantial evidence may include: (1) knowledge of the reported illegal conduct; (2) expression of a negative attitude towards the employee's report of the illegal conduct; (3) failure to adhere to established company policies regarding employment decisions; (4) discriminatory treatment in comparison to similarly-situated employees; and (5) evidence that the stated reason for the adverse employment action is false. *Zimlich*, 29 S.W.3d at 69.

## III. The Trial Court's Orders Denying Harris County's Pleas to the Jurisdiction with Respect to Luman, Verbosky, and Williams

In three issues, Harris County challenges the trial court's interlocutory orders denying its pleas to the jurisdiction with respect to the whistleblower claims asserted by Luman, Verbosky, and Williams.[7] For the reasons below, we conclude the trial court did not err in denying Harris County's pleas.

### A. Luman

In the trial court and on appeal, Harris County argued that the court lacked subject-matter jurisdiction over Luman's whistleblower claim because Luman (1) did not make a report in good faith, and (2) cannot show but-for causation in

---

[7] Harris County challenges the denials of its pleas to the jurisdiction in appellate case number 14-23-00348-CV.

light of the legitimate reasons for his termination. We disagree.

*Report*

Challenging this element, Harris County contends that Luman did not "affirmatively step[] forward with a report" as necessary to support a whistleblower claim. But the evidence shows otherwise.

At his deposition, Luman testified that, in November 2017, HCCO-2 staff were in the process of responding to Freedom of Information requests when "we realized . . . that there were maybe some issues that were going to come up in regards to some overtime and some other things that we uncovered." Luman and other staff members contacted the Harris County Attorney's Office to relay their concerns; a subsequent meeting was scheduled with Luman, Verbosky, Williams, Ranger Parker, and assistant county attorney Nick Lykos. In his notes for this meeting, Ranger Parker stated that the meeting was scheduled because "Precinct 2 Management Staff expressed concern that . . . it was possible Theft offenses may have been committed" by Bellotte. Luman provided the following information at the meeting:

- During Hurricane Harvey, Bellotte earned an overtime amount significantly higher than other officers, worked several "consecutive 24 hours days," and was classified as a "non-exempt employee." It was uncommon for commissioned law enforcement officers like Bellotte to hold a "non-exempt" status.

- Luman did not authorize or instruct Bellotte to work these hours or operate as a non-exempt employee.

- Luman had concerns about Bellotte taking a "large amount" of Hurricane Harvey donations to her house.

In a subsequent interview with Ranger Parker, Luman provided the following additional information:

13

- Bellotte's chain of command was Verbosky, Luman, and, ultimately, Constable Diaz. But this was only "on paper"; in reality, Bellotte's work was directed by Constable Diaz.

- Luman's personnel who worked 24-hour shifts during Hurricane Harvey stayed at a hotel. However, Bellotte did not stay at the hotel and Luman "did not know where [she] was during the days she claimed 24 hours on duty."

- Luman did not question Bellotte about her work hours because he "believed that based on Bellotte and Diaz's relationship, Diaz probably authorized the hours."

- Bellotte became upset when her status was changed to that of an "exempt" employee. Bellotte "pointed at Diaz's door and stated, 'He knew all about this and I'm not going down alone.'"

Via these interviews with Ranger Parker, Luman conveyed information that exposed or corroborated a violation of law or otherwise provided relevant, additional information that would help identify or investigate illegal conduct. *See* Tex. Gov't Code Ann. § 554.002(a); *Pridgen*, 653 S.W.3d at 184. Specifically, this information assisted Ranger Parker in his investigation into whether Bellotte committed theft or tampered with government records. *See* Tex. Penal Code Ann. §§ 31.03 (theft), 37.10 (tampering with governmental record). Therefore, the evidence raises an issue of fact regarding whether Luman made a "report" as that term is used in the Act. *See Mission Consol. Indep. Sch. Dist.*, 372 S.W.3d at 635.

### *Good Faith*

The evidence also raises an issue of fact with respect to the objective and subjective components of the good-faith inquiry.

Luman's actions after irregularities were noted during the process of responding to the Freedom of Information requests indicate he subjectively believed he was reporting conduct that constituted a violation of law. Luman first reported his concerns to the Harris County Attorney's Office and subsequently met

14

with Ranger Parker. In the notes from his meetings with Luman, Ranger Parker specifically stated that he "conducted the interview pursuant to allegations that Bellotte committed the offense of Tampering with a Government Record, as well as a variety of Theft related offenses." *See Univ. of Houston*, 403 S.W.3d at 856; *see also, e.g.*, *Perez v. Cameron Cnty.*, No. 13-17-00581-CV, 2018 WL 6219630, at \*5 (Tex. App.—Corpus Christi-Edinburg Nov. 29, 2018, no pet.) (mem. op.) ("Perez reported her concerns to the FBI, which suggests that Perez subjectively believed that the conduct reported was a violation of law.").

Further, Luman testified at his deposition that, "when the Rangers investigate, they're investigating to determine whether there's been a violation of law." *See, e.g.*, *Univ. of Houston*, 403 S.W.3d at 856-57 (the plaintiff's evidence satisfied the subjective component of the good-faith inquiry where he testified that he believed the violations he reported "were violations of law"); *Bexar Cnty. v. Lopez*, 94 S.W.3d 711, 715-16 (Tex. App.—San Antonio 2002, no pet.) (concluding the good-faith prong was met because "Lopez unequivocally state[d], in his deposition, that he believed a law had been violated").

The evidence also raises an issue of fact regarding whether Luman's belief that a law had been violated was reasonable in light of his training and experience. At the time of the Texas Rangers' investigation, Luman had been working in law enforcement for approximately 20 years. As evidenced in his interviews with Ranger Parker, Luman was familiar with the standards for employee overtime, the exempt versus non-exempt employee statuses, and the process for inventorying donations. Moreover, the treatment of Luman's concerns about Bellotte's activities — *i.e.*, the county attorney's report to the Texas Rangers and the Rangers' subsequent investigation into the allegations — further indicates the reasonableness of Luman's belief that a violation of law had transpired. *See, e.g.*,

15

*Town of Flower Mound v. Teague*, 111 S.W.3d 742, 753 (Tex. App.—Fort Worth 2003, pet. denied) (with respect to the objective prong of the good-faith test, the court noted that "[t]he record shows that [an attorney] in the district attorney's office believed that [the reported] conduct was consistent with certain crimes").

Therefore, Luman raised an issue of fact with respect to both components of the good-faith inquiry.

### *But-For Causation*

Finally, the evidence also raises an issue of fact with respect to causation.[8]

The evidence shows that Constable Diaz first became aware of the Texas Rangers' report in February 2019. Approximately two months later, Constable Diaz received a letter from assistant chief deputy Hernandez, in which Hernandez stated that there was "a regime that exists within this office which have [sic] oppressive undertones and creates an environment that does not seem to support positive change or diversity." Continuing on, Hernandez asserted that he particularly was concerned "by the lack of leadership and communication" from Luman. Hernandez also stated that Luman has the "intent to undermine the Constable or continue to create an environment that appears directionless and chaotic."

Hernandez later was asked to identify "the individuals in leadership/command who are inhibiting progress or 'intentionally' working against the Constable to undermine or sabotage the department's goals/agenda." In response, Hernandez identified Luman, Verbosky, Carrion, and Vara-Leija.

---

[8] The evidence shows that Luman was terminated more than 90 days after his interviews with the Texas Rangers. Therefore, Luman is not entitled to a rebuttable presumption of a causal connection. *See* Tex. Gov't Code Ann. § 554.004(a); *Houston Indep. Sch. Dist.*, 2023 WL 413573, at *3.

16

Hernandez also stated:

> There was an intentionally [sic] coup, orchestrated by Chief Jerry Luman (along with Asst. Chief Norman Verbosky, Lt. David Williams, Sgt. Marcus Anderson, and Lt. Kritzler) with the intent to undermine the agenda of Constable Diaz. This began at the time when Lt. Kim Bellotte was under investigation for her actions. Perhaps Chief Luman believed Constable Diaz to [be] weakened by this investigation. Chief Luman, along with those mentioned above often met privately and also spoke negatively, even disrespectfully regarding the office and Constable Chris Diaz.

In May 2019, Luman was placed on indefinite suspension pending an Internal Affairs Division investigation into the alleged derogatory statements he made to Hernandez. In the letter informing him of the investigation, Luman was told: "you have displayed a lack of commitment and have displayed concerning behavior that undermined the Constable's ability to operate the Precinct 2 office with efficiency."

As part of the investigation, Luman underwent a polygraph examination that focused on questions inquiring whether he told anyone in HCCO-2 that (1) Constable Diaz would soon be indicted; (2) Luman "would not make any decisions regarding the Constable's job"; and (3) "the less work they did the better." The polygraph examiner concluded that Luman was "considered to be untruthful" in response to these inquiries.

In a July 2019 internal memorandum, Constable Diaz stated that Luman would be terminated because Luman "displayed a lack of commitment concerning behavior that undermined [Constable Diaz's] ability to operate the Precinct 2 office with efficiency." Constable Diaz also stated that his decision to terminate Luman was based "solely" on the Internal Affairs Division investigation. Luman received notice of his termination in an August 1, 2019 letter from Constable Diaz that

17

stated:

> My decision to terminate you is based on my loss of confidence, complete lack of trust and faith in your continued ability to perform your duties, and actions that demonstrate you no longer support my strategy and vision moving forward.

In his subsequent report filed with the Texas Commission on Law Enforcement, Constable Diaz stated that Luman was dishonorably discharged. Luman challenged this designation before the State Office of Administrative Hearings. Overturning the "dishonorably discharged" designation, the administrative law judge noted that, "at the time of this incident, there were numerous conflicts between members of Precinct Two" and concluded that "the evidence supported [Luman's] claim that his role in the Texas Ranger investigation of Lt. Bellotte may have placed [Luman] out of favor with Constable Diaz."

With his response to Harris County's plea to the jurisdiction, Luman also included a declaration from expert witness Steven Rabago, a law enforcement investigator. Rabago stated that he had never seen a polygraph examination "used as the sole criteria in determining truth in an investigation." Rabago also opined that the questions submitted to Luman were "very broad."

This evidence, viewed together and in the light most favorable to Luman, raises an issue of fact regarding the presence of a causal connection between Luman's involvement in the Texas Rangers' investigation and his subsequent termination from HCCO-2. Specifically, this evidence shows (1) Constable Diaz knew of Luman's statements to Ranger Parker, (2) there was an expression of negative attitude toward Luman's involvement in the investigation, and (3) the stated reason for Luman's termination was false or deceptive. *See Zimlich*, 29 S.W.3d at 69. Therefore, Luman met his burden of proof with respect to this element of his whistleblower claim at this stage of the proceedings.

18

In sum, we conclude the evidence raises an issue of fact regarding whether Luman made a report in good faith and established a causal connection between his report and subsequent termination. *See* Tex. Gov't Code Ann. § 554.002; *Pridgen*, 653 S.W.3d at 182. Therefore, the trial court did not err in denying Harris County's plea to the jurisdiction with respect to Luman's whistleblower claim. *See Tex. Health & Human Servs. Comm'n*, 674 S.W.3d at 280; *see also* Tex. Gov't Code Ann. §§ 554.003(a), 554.0035.

We overrule Harris County's first issue.

### B. Verbosky

Similar to the challenges raised with respect to Luman's claim, Harris County argued in the trial court and on appeal that the court lacked subject-matter jurisdiction over Verbosky's whistleblower claim because Verbosky (1) did not make a report in good faith, and (2) cannot show but-for causation in light of the legitimate reasons for his termination. Again, we disagree.

*Report*

The evidence raises an issue of fact regarding whether Verbosky's statements to Ranger Parker exposed or corroborated a violation of law or otherwise provided relevant, additional information that would help identify or investigate illegal conduct. *See Pridgen*, 653 S.W.3d at 184.

Verbosky, while working with Luman and Williams, noted irregularities in Bellotte's timesheets while responding to Freedom of Information requests. These irregularities were reported to the Harris County Attorney's Office and Verbosky, with Luman and Williams, met with Ranger Parker in February 2018. At this meeting, Verbosky provided the following information:

- Verbosky was Bellotte's immediate supervisor and he did not

authorize her to work multiple consecutive 24-hour days during Hurricane Harvey. Verbosky described Bellotte as "difficult to manage."

- Verbosky expressed that he also was concerned regarding whether Bellotte was properly inventorying and logging Hurricane Harvey donations.

In a subsequent interview with Ranger Parker, Verbosky provided the following additional information:

- Although he was designated as Bellotte's supervisor, Verbosky said Bellotte reported "directly to Constable Diaz." Verbosky said none of the other lieutenants were similarly privileged.

- Verbosky said Bellotte would "frequently conduct[] departmental business" without his authorization. Verbosky also said that Bellotte was involved in the hiring and firing of employees.

- Verbosky said he "did not know what Bellotte's daily activities were." Verbosky believed that Bellotte and Constable Diaz "did not want him to know of Bellotte's daily activities."

- Verbosky stated that he "was frequently uncomfortable signing Bellotte's timesheets as he was unaware of her daily activities."

- According to Verbosky, a HCCO-2 sergeant reported to him that Bellotte had said "when she was cleared of the allegations heads were going to roll."

Via these interviews with Ranger Parker, Luman conveyed information that exposed or corroborated a violation of law or otherwise provided relevant, additional information that would help identify or investigate illegal conduct. *See* Tex. Gov't Code Ann. § 554.002(a); *Pridgen*, 653 S.W.3d at 184. Specifically, this information assisted Ranger Parker in his investigation into whether Bellotte had committed theft or tampered with government records, and the extent to which those allegations involved Constable Diaz. *See* Tex. Penal Code Ann. §§ 31.03 (theft), 37.10 (tampering with governmental record). Therefore, the evidence raises an issue of fact regarding whether Verbosky made a "report" as that term is

used in the Act. *See Mission Consol. Indep. Sch. Dist.*, 372 S.W.3d at 635.

*Good Faith*

The evidence also raises an issue of fact regarding the subjective and objective components of the good-faith inquiry.

As with Luman, Verbosky's involvement in the initial response to the Freedom of Information requests, the subsequent reported irregularities to the Harris County Attorney's Office, and the meetings with Ranger Parker suggest that Verbosky subjectively believed he was reporting a violation of law. *See Univ. of Houston*, 403 S.W.3d at 856 *see also, e.g.*, *Perez*, 2018 WL 6219630, at *5.

This subjective belief was further established at his deposition, in which Verbosky was asked to describe "each of the illegal activities" he reported to the Texas Rangers. In response, Verbosky testified that Bellotte "was soliciting funds and items for Precinct 2 that were supposed to go to the — to the hurricane victims in Precinct 2" without having the authority to do so. Elaborating on this point, Verbosky explained that "you're not allowed to go out and solicit funds or items . . . in the county government" without first receiving approval from the commissioner's court. When asked what other "illegal activity" Bellotte was engaged in, Verbosky said she "was claiming to work 24 hours a day for several days in a row." *See, e.g.*, *Univ. of Houston*, 403 S.W.3d at 856-57; *Bexar Cnty.*, 94 S.W.3d at 715-16.

The evidence also raises an issue of fact regarding whether Verbosky's belief that a law had been violated was reasonable in light of his training and experience. *See Univ. of Houston*, 403 S.W.3d at 856-57. At the time of the Texas Rangers' investigation, Verbosky had extensive experience working in law enforcement. As evidenced in his interviews with Ranger Parker, Verbosky was

21

familiar with the standards for employee overtime, the exempt versus non-exempt employee statuses, and the process for inventorying donations. And as discussed above, the treatment of these concerns about Bellotte's activities further supports the reasonableness of Verbosky's belief that a violation of law had transpired. *See, e.g.*, *Town of Flower Mound*, 111 S.W.3d at 753.

Therefore, Verbosky raised an issue of fact with respect to both components of the good-faith inquiry.

### But-For Causation

Finally, the evidence also raises an issue of fact with respect to causation.[9]

As discussed above, the evidence shows that Constable Diaz first became aware of the Texas Rangers' report in February 2019. Approximately two months later, Constable Diaz received a letter from assistant chief deputy Hernandez, informing Constable Diaz that there was a "regime" within the office that had "oppressive undertones." Hernandez later was asked to identify "the individuals in leadership/command who are inhibiting progress or 'intentionally' working against the Constable to undermine or sabotage the department's goals/agenda." In response, Hernandez identified Luman, Verbosky, Carrion, and Vara-Leija and alleged that these individuals' "coup" began "when Lt. Kim Bellotte was under investigation for her actions."

According to Verbosky's declaration, he was asked to report to a meeting with Luman in March 2019. At the meeting, Verbosky was informed he was "terminated effective immediately" on the orders of Constable Diaz. Verbosky

---

[9] The evidence shows that Verbosky was terminated more than 90 days after his interviews with the Texas Rangers. Therefore, Verbosky is not entitled to a rebuttable presumption of a causal connection. *See* Tex. Gov't Code Ann. § 554.004(a); *Houston Indep. Sch. Dist.*, 2023 WL 413573, at *3.

subsequently received a letter from Constable Diaz stating:

> The purpose of this letter is to inform you of my decision to terminate your employment with Harris County Constable Precinct 2 Office effective immediately. This decision is based on my loss of confidence, complete lack of trust and faith in your continued ability to perform your duties, and actions that demonstrate you no longer support my strategy and vision moving forward.

But contrary to the reasons given in Constable Diaz's letter, Verbosky stated that he "had no disciplinary history, was never written up, and [his] disciplinary record was clean." Verbosky also stated that his position as assistant chief deputy (second in line to Constable Diaz) subsequently was filled by Hernandez.

Verbosky also asserted that Constable Diaz failed to follow the termination procedure required by Texas Government Code section 614.023, which states in relevant part:

> (b) Disciplinary action may not be taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee.

> (c) In addition to the requirement of Subsection (b), the officer or employee may not be indefinitely suspended or terminated from employment based on the subject matter of the complaint unless:

> (1) the complaint is investigated; and

> (2) there is evidence to prove the allegation of misconduct.

Tex. Gov't Code Ann. § 614.023(b), (c). Similarly, law enforcement expert Rabago attested that, "[t]o [his] knowledge, there was no formal investigation conducted by Harris County Pct. 2 based on the allegations presented by Constable Diaz." Referencing Constable Diaz's termination letter to Verbosky, Rabago opined that the letter relied on mere "buzzwords used to terminate police officers who are not liked."

23

At his deposition, Constable Diaz was asked to provide his "reasons for terminating Norman Verbosky." In response, Constable Diaz stated, "I can't remember." Constable Diaz also was asked about his "opinion of [Verbosky] as [to] the performance of his job duties at precinct 2," to which Diaz replied: "No opinion."

This evidence, viewed in the light most favorable to Verbosky, raises an issue of fact regarding the presence of a causal connection between Verbosky's involvement in the Texas Rangers' investigation and his subsequent termination from HCCO-2. As with Luman, the evidence indicates that Constable Diaz was aware of Verbosky's involvement in the Texas Rangers' investigation and that there was an expression of negative attitude towards that involvement. *See Zimlich*, 29 S.W.3d at 69. The evidence also shows that the termination procedures outlined in Texas Government Code section 614.023 were not followed, thus indicating a failure to adhere to policies. *See id.* Finally, the evidence suggests the stated reasons for Verbosky's termination were false — particularly since, at his deposition, Constable Diaz could not recall any details about Verbosky's employment or his subsequent termination. Therefore, Verbosky met his burden of proof with respect to this element of his whistleblower claim at this stage of the proceedings.

We overrule Harris County's second issue.

**C.     Williams**

Similar to its challenges raised with respect to Luman and Verbosky, Harris County argued in the trial court and on appeal that the court lacked subject-matter jurisdiction over Williams' whistleblower claim because Williams (1) did not make a report in good faith, and (2) cannot show but-for causation in light of the legitimate reasons for his termination. As with Luman and Verbosky, we disagree

24

and conclude the evidence satisfies Williams' burden of proof at this stage of the proceedings.

*Report*

The evidence raises an issue of fact regarding whether Williams' statements to Ranger Parker exposed or corroborated a violation of law or otherwise provided relevant, additional information that would help identify or investigate illegal conduct. *See Pridgen*, 653 S.W.3d at 184.

Williams, while working with Luman and Verbosky, noted the irregularities in Bellotte's timesheets while responding to Freedom of Information requests. These irregularities were reported to the Harris County Attorney's Office and Williams, along with Luman and Verbosky, met with Ranger Parker in February 2018. At this meeting, Williams provided the following information:

- Williams stated that he "asked Lieutenant Bellotte if she or any of her subordinates recorded anything with regard to inventory of the donations coming into Precinct 2 Constable's Office possession, and if so the final disposition of the donations." According to Williams, "Bellotte told him that she had not recorded anything with regard to the donations."

- Williams said an "additional area of concern" arose when Lieutenant Bellotte obtained a large number of dry-fit shirts and "the subsequent screen printing of the Precinct 2 Constable badge on the shirts." Williams said the shirts were distributed to the community.

Although Williams did not provide the same quantity of information as Luman and Verbosky, the evidence nonetheless raises a fact issue regarding whether Williams made a "report" under the Whistleblower Act. *See id*. at 182-86. As the Texas Supreme Court explained in *Pridgen*, the provision of information constitutes a "report" if it conveys facts that expose or corroborate a violation of law or assists in identifying or investigating illegal conduct. *Id*. at 184. Williams' statements to

25

Ranger Parker meet this standard: they indicated that Williams inquired with Bellotte regarding whether proper recording procedures were followed with respect to the received donations and Bellotte told him she "had not recorded anything." Further, Williams' statements provided a specific example with respect to the questionable distribution of the donations, namely, the dry-fit shirts that were distributed to members of the community after they were printed with the HCCO-2 badge.

As Ranger Parker repeatedly stated in the Texas Rangers' report, his meetings were intended to investigate whether Bellotte "committed the offense of Tampering with a Government Record as well as a variety of Theft related offenses." The information provided by Williams assisted in investigating this illegal conduct. Therefore, the evidence raises an issue of fact regarding whether Williams made a "report" as that term is used in the Whistleblower Act. *See* Tex. Gov't Code Ann. § 554.002; *Pridgen*, 653 S.W.3d at 184.

### Good Faith

The evidence also raises an issue of fact regarding the subjective and objective components of the good-faith inquiry.

As with Luman and Verbosky, Williams' involvement in the initial response to the Freedom of Information requests, the subsequent reported irregularities to the Harris County Attorney's Office, and the meetings with Ranger Parker suggest that Williams subjectively believed he was reporting a violation of law. *See Univ. of Houston*, 403 S.W.3d at 856; *see also, e.g.*, *Perez*, 2018 WL 6219630, at *5. Further underscoring this subjective belief, Williams responded as follows when asked to describe what he relayed to Ranger Parker:

> [I] told Mr. Parker and the group that we had concerns about the Hurricane Harvey supplies that we believed had been misappropriated

26

for — inappropriately or had been misappropriated without being properly received by Harris County or otherwise logged as campaign donations for Mr. Diaz.

In addition to that we had concerns about the time slips that Kim Bellotte had submitted that — that showed that she had worked for eight days, 24 hours a day, eight days straight.

Discussing the allegedly misappropriated donations, Williams explained that, "for a public entity to accept a donation, the proper authority to do that is the governing authority which in this case would be the Commissioner's Court[.]" Williams alleged that Bellotte did not follow this procedure and that the donations "were redirected for political purposes without any accountability." This evidence raises an issue of fact regarding whether Williams subjectively believed that a violation of law had occurred. *See, e.g.*, *Univ. of Houston*, 403 S.W.3d at 856-57; *Bexar Cnty.*, 94 S.W.3d at 715-16.

The evidence also raises an issue of fact regarding whether this belief was reasonable. Williams had been employed as a law enforcement officer for approximately 30 years before his involvement in the Texas Rangers' investigation. Based on his statements to Ranger Parker and his deposition, it is clear that Williams was familiar with the laws and procedures governing the receipt and subsequent distribution of donations. And as discussed above, the treatment of these concerns about Bellotte's activities further supports the reasonableness of Williams' belief that a violation of law had occurred. *See, e.g.*, *Town of Flower Mound*, 111 S.W.3d at 753. Therefore, Williams' belief that he was reporting a violation of law was objectively reasonable in light of his training and experience. *See id*.

We conclude that Williams raised an issue of fact with respect to both components of the good-faith inquiry.

### But-For Causation

Finally, the evidence also raises an issue of fact with respect to causation.[10]

As discussed above, the evidence shows that Constable Diaz received a copy of the Texas Rangers' report in February 2019. Shortly thereafter, Hernandez identified Williams as a member of the "coup" seeking to "undermine the agenda of Constable Diaz." Hernandez stated that the "coup" traced its origins to "the time when Lt. Kim Bellotte was under investigation for her actions."

In his August 28, 2019 resignation letter to Constable Diaz, Williams laid out the changes in his employment that had occurred since the Texas Rangers' investigative report was published in February 2019:

- Williams originally was employed as a lieutenant but, since February 2019, he was demoted to "the lowest possible police rank . . . and pay grade system." Williams stated that his yearly salary was reduced by approximately $50,000.

- Williams was assigned to a new one-person 3:00 p.m. to 11:00 p.m. shift "specifically designed to disrupt [his] personal life."

- Although he originally was charged with managing "large cadres of personnel" within the HCCO-2 office, Williams no longer was assigned these supervisory responsibilities.

- Williams was originally employed "as a 30-year veteran executive-level police manager" but was "reassigned to work under younger, much less experienced personnel who have never occupied any type of law enforcement managerial position(s)."

- Hernandez previously stated within William's earshot that Williams "should not have ever gotten into his 'crosshairs.'"

According to the Texas Supreme Court, "adverse personnel action" under the

---

[10] The evidence shows that Williams was terminated more than 90 days after his interviews with the Texas Rangers. Therefore, Williams is not entitled to a rebuttable presumption of a causal connection. *See* Tex. Gov't Code Ann. § 554.004(a); *Houston Indep. Sch. Dist.*, 2023 WL 413573, at *3.

Whistleblower Act refers to those actions "likely to dissuade a reasonable, similarly situated worker from making a report under the act." *Montgomery Cnty. v. Park*, 246 S.W.3d 610, 614 (Tex. 2007). The actions listed in Williams' resignation letter, considered in light of this definition, are sufficient evidence of adverse personnel actions. *See id.*; *see also, e.g.*, *Ward v. Lamar Univ.*, 484 S.W.3d 440, 448-49 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (evidence showing the defendant removed the plaintiff's procurement responsibility, 15 people from her supervision, and her authority over the department was sufficient evidence of an "adverse personnel action"); *Gray v. City of Galveston*, No. 14-12-00183-CV, 2013 WL 2247386, at *12 (Tex. App.—Houston [14th Dist.] May 21, 2013, no pet.) (mem. op.) (reassignment of police lieutenant from commander of a division in which he reported directly to police chief to a position in which he reported to a sergeant and his receipt of letters of reprimand were sufficient evidence of an "adverse personnel action").

In the trial court and on appeal, Harris County asserts Williams lacks any evidence to establish causation because Harris County had legitimate, non-retaliatory reasons for his termination. *See Off. of Att'y Gen. v. Rodriguez*, 605 S.W.3d 183, 192 (Tex. 2020) (noting that the Whistleblower Act "preserves an employer's right to fire an employee when it has sufficient sound reasons" to do so). Specifically, Harris County argues that Williams was demoted following the results of an Internal Affairs Division investigation.

The investigation was conducted in July 2019 and looked into allegations that (1) there was a discrepancy with respect to a single entry on one of Williams' timesheets, and (2) Williams violated an HCCO-2 regulation that prohibited deputies from working extra employment while on suspension. With respect to the first allegation, Williams asserted that it was "an unintentional oversight and

human error" that led him to input an incorrect eight-hour block of time on his timesheet. Noting that these types of errors are "commonplace," Williams stated that he amended the timesheet. Williams did not receive any extra compensation for the timesheet error. The Internal Affairs Department investigation concluded that this chain of events did not constitute a policy violation.

However, the Internal Affairs Department investigation concluded that the second allegation constituted a policy violation. Specifically, the investigation determined that Williams violated applicable regulations by working "extra employment" at Hendricks Polygraph while he was on suspension. The investigation also found that Williams altered his work schedule on three days without receiving prior approval. A subsequent letter to Constable Diaz set out three reasons to support Williams' termination:

(1) Violation of Department Policy (Extra Jobs)
(2) Insubordination (Disregard of Supervisor's Directive)
(3) Untruthfulness (Timesheets and Location of Offense)

Responding to Harris County's plea to the jurisdiction, Williams included a declaration from law enforcement expert Rabago. In his declaration, Rabago noted that HCCO-2 regulations defined "extra employment" as work for which "compensation is received." Rabago stated that the Internal Affairs Department investigation "did not produce any evidence indicating that Lt. Williams was compensated by Hendricks Polygraph."

With respect to the conclusion that Williams impermissibly altered his work schedule, Rabago asserts that the investigation "did not find any evidence to support this conclusion." However, Rabago pointed out that the letter to Constable Diaz recommending Williams' termination asserted that Williams was untruthful with respect to his timesheets — even though the investigation concluded that this

30

allegation did not yield a policy violation.

Williams also attached as evidence a declaration from Kelly Hendricks, the owner of Hendricks Polygraph. According to Hendricks, Williams completed two polygraph examinations while Hendricks was hospitalized. Hendricks said Williams "did not receive any compensation from Hendricks Polygraph, Inc. for administering these exams."

Taken together and viewed in the light most favorable to Williams, this evidence raises an issue of fact regarding whether there was a causal connection between Williams' participation in the Texas Rangers' investigation and the subsequent adverse personnel actions. *See Zimlich*, 29 S.W.3d at 67; *Houston Indep. Sch. Dist.*, 2023 WL 413573, at *4. Constable Diaz had knowledge of the Texas Rangers' investigative report and, via Hernandez, there was an expression of a negative attitude towards those who participated in the investigation. In the months following, Williams was subjected to a string of adverse personnel actions. Harris County provided evidence to support its contention that there was a legitimate reason for these actions but, when considered in conjunction with Williams' responsive evidence, it does not as a matter of law show the absence of a causal connection. Finally, considered with Luman's and Verbosky's whistleblower claims, the evidence suggests an overarching pattern of retaliation within HCCO-2 aimed at those who participated in the Texas Rangers' investigation.

Therefore, Williams met his burden of proof with respect to this element of his whistleblower claim at this stage of the proceedings. We overrule Harris County's third issue.

**IV. The Trial Court's Order Granting Harris County's Summary Judgment Motion on Luman's Whistleblower Claim**

With its plea to the jurisdiction, Harris County also filed a combined traditional and no-evidence summary judgment motion challenging Luman's whistleblower claim. *See* Tex. R. Civ. P. 166a(c), (i). The summary judgment motion challenged the same elements as Harris County's plea, namely, whether Luman could establish that (1) he in good faith reported a violation of law, and (2) there was a causal connection between his participation in the Texas Rangers' investigation and his subsequent termination. Although the trial court denied Harris County's plea to the jurisdiction, it signed an order granting Harris County's summary judgment motion. The trial court also signed an order severing Luman's claim from the remainder of the suit, thus rendering the summary judgment final and subject to appeal.[11]

As discussed above, we conclude Luman produced evidence sufficient to raise an issue of fact with respect to the challenged elements of his whistleblower claim. Therefore, the trial court erred when it rendered summary judgment on Luman's claim. *See* Tex. R. Civ. P. 166a(c), (i). We sustain Luman's issue.

**V. The Trial Court's Interlocutory Orders Granting Harris County's Pleas to the Jurisdiction With Respect to Carrion, Vara-Leija, and Pacifico**

In the third appeal,[12] Carrion, Vara-Leija, and Pacifico raise four issues challenging the trial court's interlocutory orders granting Harris County's pleas to the jurisdiction:

1. Carrion, Vara-Leija, and Pacifico reported violations of law in good faith to an appropriate law enforcement agency;

---

[11] Luman appealed the final judgment granting Harris County's summary judgment motion in appellate case number 14-23-00736-CV.

[12] Appellate case number 14-23-00672-CV.

32

2. Carrion, Vara-Leija, and Pacifico suffered adverse employment consequences;

3. the reports made by Carrion, Vara-Leija, and Pacifico were the but-for causes of the adverse employment consequences; and

4. Carrion and Vara-Leija were not required to exhaust Harris County's grievance procedure.

For the reasons below, we affirm the challenged orders.

## A. Carrion and Vara-Leija

Both Carrion and Vara-Leija resigned from their Harris County employment after they allegedly were subject to retaliatory personnel actions. In the trial court and on appeal, Harris County asserted that Carrion and Vara-Leija cannot proceed with their whistleblower claims because they did not initiate a grievance with respect to the alleged retaliatory treatment.

Under the Act, "[a] public employee must initiate action under the grievance or appeal procedures of the employing state or local governmental entity relating to suspension or termination of employment or adverse personnel action before suing under this chapter." Tex. Gov't Code Ann. § 554.006. As relevant here, the Harris County "Personnel Policies & Procedures" manual provides a grievance procedure for "all County employees" to resolve complaints regarding "conditions of work that adversely affect[] an employee." However, the grievance procedures state as follows with respect to employees that have left the County's employment:

> Grievance based upon an employee's termination from employment are denied upon filing. If at any point in the grievance process, the employee separates from the County, the grievance process ends.

Citing this provision, Carrion and Vara-Leija assert they were not required to initiate an action under Harris County's grievance procedure before filing their whistleblower claims.

33

We recently examined a similar argument in *City of Houston v. Garcia*, 668 S.W.3d 419 (Tex. App.—Houston [14th Dist.] 2023, no pet.). There, the plaintiff was fired from her probationary employment with the City of Houston and proceeded to sue the City under the Whistleblower Act. *Id*. at 421. Even though there was no "applicable formal grievance or appeal procedure" with respect to the plaintiff's termination, the City argued that the Whistleblower Act nonetheless required her to give some notice to the City before pursuing her claim. *Id*. at 424.

Considering this issue, we noted that "[i]t is the binding precedent of this Court that the absence of a formal procedure does not relieve the employee of the requirement to initiate a grievance, even if the employee must do so informally." *Id*. at 425 (citing *Ward*, 484 S.W.3d at 447-48; *Berry v. Bd. of Regents of Tex. S. Univ.*, 116 S.W.3d 323, 325 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)). We also distinguished a case with facts analogous to those presented here, in which the grievance procedure specifically exempted terminated employees. *See id*. at 424 (citing *Perez*, 2018 WL 6219630, at *2).[13] Therefore, despite the absence of an applicable grievance procedure, an employee asserting a whistleblower claim nonetheless is required to provide fair notice to the employer of (1) the employee's desire to appeal the personnel decision, and (2) the personnel decision from which the employee seeks to appeal. *See id*. at 424-25.

In sum, we held that the *Garcia* plaintiff did not provide the necessary "fair notice" of her intent to assert a whistleblower claim because her communications

---

[13] In *Perez*, the plaintiff asserted a whistleblower claim against Cameron County, contending she was terminated for reporting illegal activity. 2018 WL 6219630, at *1. Similar to the grievance policy here, the applicable policy in *Perez* stated that "[t]he grievance procedure provided in the following sections is not available to the employee who has been involuntarily dismissed from employment by the County." *Id*. at *2. Noting that the grievance policy expressly excluded terminated employees like Perez, the court of appeals held that Perez "was not required to exhaust administrative remedies that were not available to her." *Id*. at *3.

to her manager "refer[red] only to the possibility that [the plaintiff] might be subjected to adverse personnel action in the future" and occurred "months before she was terminated." *Id.* at 425. The communications "did not address [the plaintiff's] termination or notify the City that [the plaintiff] sought administrative review of her termination." *Id.*

Guided by this precedent, we conclude that Carrion and Vara-Leija failed to raise an issue of fact regarding whether they provided Harris County fair notice of their desire to appeal the challenged personnel actions. *See* Tex. Gov't Code Ann. § 554.006; *see also, e.g.*, *Garcia*, 668 S.W.3d at 424-25. In the trial court and on appeal, neither Carrion nor Vara-Leija pointed to any evidence in the record to show that they provided any type of notice regarding their intent to appeal the alleged retaliatory conduct.

Rather, Carrion and Vara-Leija only asserted that they were not required to initiate any type of grievance process under the applicable Harris County procedures. But, as we held in *Garcia*, it is incumbent upon plaintiffs to provide informal notice of their intent to appeal retaliatory employment decisions even in the absence of an applicable grievance procedure. *See Garcia*, 668 S.W.3d at 424-25; *see also Ward*, 484 S.W.3d at 447-48; *Berry*, 116 S.W.3d at 325. In the absence of any evidence showing that Carrion or Vara-Leija provided Harris County with some form of pre-suit notification regarding their whistleblower claims, we conclude the trial court did not err in granting Harris County's pleas to the jurisdiction with respect to Carrion's and Vara-Leija's claims.

We overrule the arguments raised in Carrion's and Vara-Leija' fourth issue regarding the applicable grievance procedures. Because this jurisdictional prerequisite was not satisfied, we need not address Carrion's and Vara-Leija's other challenges on appeal.

## B.     Pacifico

Because Pacifico was not involved in the Texas Rangers' investigation, the facts underlying his whistleblower claim are different from those discussed above.

In March 2005, the HCCO-2 office hired Pacifico as a deputy constable. Pacifico worked his way through the ranks and was promoted to the position of deputy investigator in January 2018.

In February 2019, HCCO-2 performed its annual driver's license and insurance verification check on all its employees. Pacifico was charged with performing the check on approximately half of the HCCO-2 employees. During this review, Pacifico learned that assistant chief clerk Jessica Duran had a suspended driver's license. On March 8, 2019, Pacifico wrote a memorandum to Williams informing him that Duran's driver's license was suspended.

After these findings were reported, an internal affairs department investigation was opened with respect to Duran. The April 2019 investigative report concluded that Duran breached two Harris County personnel regulations: one that prohibited insubordination and a second that required employees to notify their department head of a change of status with respect to a driver's license.

In March 2020, Pacifico was arrested for felony injury to a child. HCCO-2 terminated Pacifico's employment shortly thereafter, citing his "criminal arrest and charges of Felony Injury to a Child." Pacifico subsequently sued Harris County and asserted a whistleblower claim, alleging that he was fired in retaliation for reporting "the suspended driver's license of Assistant Clerk Jessica Duran."

Harris County filed a plea to the jurisdiction, arguing that Pacifico could not produce evidence showing (1) he in good faith reported a violation of law, and (2) a causal connection between his report on the status of Duran's driver's license

36

and his subsequent termination. The trial court signed an order granting Harris County's plea to the jurisdiction, which Pacifico challenges on appeal.

Because Pacifico did not raise an issue of fact showing he in good faith reported a violation of law, we conclude the trial court did not err in granting Harris County's plea to the jurisdiction.

As stated above, the good-faith inquiry is comprised of two prongs that require an employee to show (1) he subjectively believed he was reporting conduct that constituted a violation of law, and (2) that belief was objectively reasonable in light of the employee's training and experience. *Pridgen*, 653 S.W.3d at 184 n.5; *Univ. of Houston*, 403 S.W.3d at 856. Pacifico's evidence satisfies the subjective prong of the good-faith inquiry. Specifically, at his deposition, Pacifico testified that he "reported that [Duran] had broken the law" in his memorandum to Williams. *See, e.g.*, *Univ. of Houston*, 403 S.W.3d at 856-57; *Bexar Cnty.*, 94 S.W.3d at 715-16.

However, the evidence does not raise an issue of fact regarding whether this belief was objectively reasonable in light of Pacifico's training and experience. *See Univ. of Houston*, 403 S.W.3d at 856. As stated above, a law enforcement officer's belief that a law has been violated will be examined more closely than the belief of one in a non-law enforcement position. *Harris Cnty. Precinct Four Constable Dep't*, 922 S.W.2d at 956. Here, the evidence shows that Pacifico had approximately 15 years of law enforcement experience when he reported Duran's driver's license status to Williams. A law enforcement officer with this type of experience would not believe he was reporting conduct that constituted a violation of law.

In his declaration, Pacifico described his task as follows:

On February 15, 2019, the department performed its annual driver's license, insurance, and criminal history check. I was instructed by Chief Jerry Luman to update the Harris County Constable's Office Precinct 2 drivers' licenses and insurance statuses for all departmental personnel with last names beginning A-M, as part of an annual verification.

Continuing on, Pacifico said he learned Duran's driver's license was suspended as of November 2018.

In his subsequent memorandum to Williams, Pacifico stated as follows:

I conducted an inquiry via JIMS on Assistant Chief Clerk Duran and located her by her assigned SPN number. Once I obtained and verified the SPN was her, I conducted a full criminal history check. Assistant Chief Clerk Duran's Texas driver's license [] returned with a "Non Eligible" status as of November, 2018 for nonpayment of surcharges. The owed surcharges stemmed from a Failure to Maintain Financial Responsibility citation she received from Harris County Constable's Office, Precinct 5 on December 24, 2016.

As this evidence shows, Pacifico only reported that Duran's driver's license was suspended. But a suspended license, standing alone, is not a violation of a state or federal statute, an ordinance of a local governmental entity, or a rule adopted under a statute or ordinance. *See* Tex. Gov't Code Ann. § 554.001(1). Rather, a suspended license is a violation of law only if its possessor is operating a motor vehicle. *See* Tex. Transp. Code Ann. §§ 521.021 (a person "may not *operate* a motor vehicle on a highway in this state unless the person holds a driver's license issued under this chapter") (emphasis added), 521.457 ("[a] person commits an offense if the person *operates* a motor vehicle . . . during a period that the person's driver's license or privilege is suspended") (emphasis added). A law enforcement officer with Pacifico's experience would not reasonably believe, in this scenario, that reporting Duran's suspended license, standing alone, constituted a violation of law as necessary to support a whistleblower claim. *See Univ. of Houston*, 403

38

S.W.3d at 856.

Therefore, because Pacifico did not produce evidence to satisfy both prongs of the good-faith inquiry, the trial court did not err in granting Harris County's plea to the jurisdiction with respect to his whistleblower claim. We overrule the arguments raised in Pacifico's first issue. Because of our disposition of this issue, we need not address Pacifico's other issues on appeal.

## CONCLUSION

We overrule the issues raised in Harris County's interlocutory appeal (case number 14-23-00348-CV) and affirm (1) the trial court's April 27, 2023 orders denying Harris County's pleas to the jurisdiction challenging the whistleblower claims asserted by Luman and Verbosky, and (2) the trial court's May 16, 2023 order denying Harris County's plea to the jurisdiction challenging Williams' whistleblower claim.

We sustain the issue raised in Luman's appeal (case number 14-23-00736-CV), reverse the trial court's final summary judgment on Luman's whistleblower claim, and remand for further proceedings.

Finally, we overrule the issues raised in Carrion's, Vara-Leija's, and Pacifico's interlocutory appeal (case number 14-23-00672-CV) and affirm the trial court's April 27, 2023 orders granting Harris County's pleas to the jurisdiction with respect to these plaintiffs' claims.

/s/     Meagan Hassan
        Justice


Panel consists of Justices Wise, Spain, and Hassan.